[No. D022078. Fourth Dist., Div. One. July 28, 1995.]

RIVER VALLEY PRESERVATION PROJECT, Plaintiff and Appellant, v. METROPOLITAN TRANSIT DEVELOPMENT BOARD et al., Defendants and Respondents.

**COUNSEL**

Craig A. Sherman for Plaintiff and Appellant.

Latham & Watkins, Christopher W. Garrett and Kimberly Arouh for Defendants and Respondents.

**OPINION**

**HOFFMAN, J.\***—River Valley Preservation Project (RVPP) appeals an order denying its petition for writ of mandate to require the Metropolitan Transit Development Board (MTDB) to prepare a supplemental or subsequent environmental impact report (SEIR) with respect to the Mission Valley West Light Rail Transit Project (LRT or Project). RVPP also appeals an order awarding MTDB its costs in preparing the administrative record. For reasons we shall discuss, we affirm both orders.

FACTUAL BACKGROUND

In November 1982 the City of San Diego began making plans for a light rail transit right-of-way in Mission Valley. In June 1985 the San Diego City Council adopted the Mission Valley Community Plan, which included a trolley line as an "essential element of the long-range transportation solution for Mission Valley." The community plan envisioned a series of urban nodes connected by a six-mile transit system at nine trolley stations from Old

---

*Judge of the San Diego Superior Court sitting under assignment by the Chairperson of the Judicial Council.

Town to San Diego Jack Murphy Stadium. In 1987 MTDB[1] adopted this proposed alignment for the Mission Valley West segment.

In 1987, San Diego voters approved a ½ percent sales tax to fund, in part, the Project. MTDB started work in December 1989 on an environmental impact report (EIR) for the Project as required by the California Environmental Quality Act (CEQA), Public Resources Code[2] section 21000 et seq.

The first two segments of the Project were referred to as the Morena Boulevard and Levi-Cushman segments. The Morena Boulevard segment runs along Morena Boulevard and Friars Road, and continues eastward along the north side of the San Diego River through River Valley Farm and through Warner Ranch which was the 11-hole River Valley Golf Course.

The Levi-Cushman segment consists of property owned by the Levi and Cushman families and Chevron Land and Development Company (Chevron). This property was originally leased for 50 years and has been used as the 27-hole Stardust Golf Course. The lease expired in July 1994. The owners had plans with the City of San Diego to develop the land into a complex of condominiums, apartments, offices and hotels (the RiverWalk Development).

On December 13, 1990, MTDB was concerned that all contracted EIR and preliminary engineering work on the Project assumed that the Chevron development would precede the Project at the Levi-Cushman segment. As such, MTDB approved a change order to undertake all environmental and preliminary engineering work on the EIR with respect to two alternative alignments: "LRT First" and "Friars Road" through the Levi-Cushman property. The LRT First alignment would be similar to the adopted alignment but preceding any development. The Friars Road alignment would be along Friars Road just north of the Stardust Golf Course.

On March 7, 1991, MTDB changed the Friars Road alternative alignment from a "temporary solution that would be operational only until a permanent

---

[1]MTDB is a regional agency made up of elected officials from San Diego, El Cajon, La Mesa, National City, Chula Vista and Imperial Beach.

[2]All statutory references are to the Public Resources Code unless otherwise specified. All references to "Guidelines" are to California Code of Regulations, title 14, section 15000 et seq., the state guidelines which implement CEQA. CEQA Guidelines supplement and explain the applicable Public Resources Code sections.

alignment could be constructed on the [Stardust] Golf Course" to a "contingency plan . . . in the event that conditions change in our efforts to coordinate the [Project] construction through the [golf course]."[3]

In the November 1991 draft EIR, the Levi-Cushman segment was to be constructed through the Stardust Golf Course. The draft stated "[i]f the [Project] is constructed prior to the development of the Levi-Cushman property, the [Project] would be constructed on an 8 to 10[-]foot high berm. The [Project] would be constructed without the benefit of flood control and other improvements that will eventually be provided by the Levi-Cushman development." The draft noted that the golf course lease expires in 1994, but may be extended on a month-to-month basis until planned development begins. The draft concluded that if the golf course remains during the Project's construction, there would be no significant biological impacts associated with this alignment and therefore no mitigation measures would be required.

On December 12, 1991, MTDB released the draft EIR for public comment. After public review including public meetings, workshops and input from homeowners and businesses, MTDB certified and approved the final EIR on May 14, 1992.

The EIR discusses hydrologic information and impacts relevant to the Project. The hydrology section of the EIR recognizes and accounts for the inundation of the Project by a 100-year flood. The EIR specifies that segments which would be within the 100-year floodplain boundaries would typically be built on elevated structures, which would be designed in such a way as to minimize the obstruction of river flow.

The EIR provides that the Levi-Cushman segment would be built on a berm and would be partially within the 100-year floodplain of the San Diego River. The EIR analyzes the design and construction of this segment to prevent any incremental increase in flood elevation. The EIR proposes mitigation measures to prevent an increase in the 100-year water-surface elevations, including a flood control channel across the Levi-Cushman property.

The EIR also considers aesthetic and visual impact issues for each segment. The visual impacts section for the Levi-Cushman segment determined

---

[3]MTDB noted that regardless of the characterization of the Friars Road alignment alternative, staff and Chevron representatives preferred that the Project run through the golf course. On October 31, 1991, the Project's preliminary engineering report found that the LRT first through the golf course was more feasible than a Friars Road alignment due to right-of-way, environmental, and traffic impacts along Friars Road.

that the LRT elevation, due to the berm, would not cause any adverse visual impact so long as the berm was "properly landscaped" and surrounding areas were maintained as a golf course. MTDB adopted specific mitigation measures to provide for this landscaping and golf course maintenance, which continue to apply to the Project.[4]

## MTDB's AUGUST AND NOVEMBER 1993 DECISIONS REGARDING THE REVISED BERM AT LEVI-CUSHMAN

On October 22, 1992, MTDB approved a contract amendment to further develop the Project alternatives through the Levi-Cushman property in case the RiverWalk Development was delayed beyond the commencement of the Project. On January 21, 1993, the executive committee for MTDB recommended that the design of the Project across the Levi-Cushman property be temporarily suspended until the RiverWalk Development schedule had been resolved. As explained in numerous MTDB reports, the revised Chevron plans postponed any development of RiverWalk, requiring MTDB to move forward with the plan studied in the EIR to build the Project before any development. The revised Levi-Cushman segment plans involved the placement of fill to raise the elevation of portions of the Project 20 to 30 feet higher than existing ground to match revised Chevron development plans.

The administrative record reflects that MTDB gave consideration to the impact of Chevron's revised development plans on the alignment of the Levi-Cushman Segment of the Project, with numerous reports and meetings where public comment was received. Cost factors led MTDB to consider moving the alignment to the north of the Levi-Cushman property, at least on a temporary basis, to avoid costly flood control improvements and construction of the berm prior to any development of the Levi-Cushman property. At its July 8, 1993 meeting, MTDB approved a number of revisions to the Project, but after extensive public comment and discussion, MTDB deferred action on a temporary alignment in the Levi-Cushman Segment.[5]

### A. Resolution No. 93-34 and Agenda Item No. 33

On August 12, 1993, MTDB approved resolution No. 93-34 (Resolution 93-94), which (among other changes not at issue here) approved an addendum to the EIR including alignment revisions for certain segments. Revisions to the Morena Boulevard segment were adopted because environmental review agencies requested MTDB to evaluate alternate alignments further north to reduce the environmental impacts to the San Diego River.

---

[4]We have limited our discussion of the EIR to the segments of the Project relating to the issues before us in this appeal.

[5]In mid-1993 Chevron informed MTDB that it would not proceed with the RiverWalk Development for at least five years.

Resolution 93-34 also approved a revision to the alignment through the Levi-Cushman segment providing for a temporary alignment to the north pending development of the area and a revision to the permanent alignment.[6] In making this decision, MTDB considered that the approved permanent alignment would have to be on a revised berm, 20 to 30 feet above existing ground level to match the grade level set forth in the revised Chevron development plans and to place the LRT above the 100-year-flood level.

The EIR addendum prepared by MTDB for Resolution 93-34 found that these alignment revisions would not involve any new environmental impacts. It found that the change to the Levi-Cushman segment alignment (including the revised berm): "reduces impacts to noise and vibration and visual quality, and has no effect on biological resources, cultural resources, traffic, land use, air quality, energy, hydrology, socioeconomic, or public safety."

In November 1993 MTDB staff determined that the temporary (alternative) alignment to the north of the Levi-Cushman segment would not result in substantial cost savings. On November 18, 1993, by agenda item No. 33, MTDB voted to (1) delete the temporary alignment alternative approved in August 1993, (2) reconfirm that the board-adopted Project alignment be utilized through the Levi-Cushman property, and (3) direct the staff to proceed with final design on this alignment as it was studied in the EIR for the Project. The original Levi-Cushman alignment was found to be a more cost-effective option because $2 million could be saved by using soils from River Valley to elevate the berm and by not having to dispose of the soils offsite.

Agenda item No. 33 provided that the design of the berm be elevated to twenty to thirty feet high with a wider four to one slope rather than the two-to-one ratio previously considered for the eight- to ten-foot berm. The agenda item also stated that "the bottom of the river channel . . . would have to be widened to 70 feet, . . ."

B. *Agenda Item No. 10*

In the EIR, the River Valley Golf Course was to be reconfigured from 11 to 9 golf holes. MTDB later purchased the River Valley Golf Course to use as a mitigation site. At the November 18, 1993 meeting, MTDB adopted agenda item No. 10 which directed a contractor to provide consultant studies

---

[6]The approved permanent alignment placed the Project back to where it was located in the original EIR.

involving the River Valley property. As a result of the River Valley Golf Course having been purchased, it was anticipated that only minor channel improvements and mostly a flat wetlands habitat would occur. Project changes in agenda item No. 10 are reflected in contract amendment No. 11 with Boyle Engineering, stating "[c]hanges have occurred which require mitigation plan revisions that include a major channel to keep the 100-year flood within acceptable elevation limits, and available land for sale for future development or future mitigation." MTDB authorized the general manager to execute contract amendment No. 11 to complete wetlands mitigation conceptual plans, additional geotechnical work and conceptual design alternatives through the golf course.

Members of RVPP were present at both the August 12 and November 18 meetings and requested that MTDB prepare an SEIR. MTDB found the changes were minimal and denied RVPP's request.

PROCEDURAL BACKGROUND

RVPP filed a petition for writ of mandate on September 13, 1993, claiming MTDB had failed to prepare an SEIR as required under section 21166. RVPP alleged the addendum to the EIR indicated substantial changes to the Project requiring major revisions of the EIR.

RVPP also filed and served on MTDB a request for the preparation of the complete administrative record. On November 29, 1993, RVPP filed a motion to determine the costs of preparing the administrative record. After hearing on December 23, 1993, the court ruled RVPP was to pay MTDB the costs of preparing the administrative record.

After hearing on April 29, 1994, the court issued a statement of decision denying RVPP's petition for writ of mandate. The court rejected RVPP's argument that MTDB's decision to forego an SEIR was not substantially supported by the administrative record. Specifically, the court found (1) the revised berm is of minimal significance because the modifications do not affect the design parameters of allowing water flow of 49,000 cubic feet per second, (2) the visual impacts of the revised berm are minimized by the proposed landscaping and golf course maintenance, (3) the revised berm reduces impacts to noise, vibration and visual quality and has no effect on

biological resources, cultural resources, traffic land use, air quality, hydrology, socioeconomic or public safety, and (4) the revised berm will be located on "disturbed land."[7]

The court also found the consultant studies authorized in agenda item No. 10 did not constitute a final wetlands mitigation plan for the Warner Ranch (River Valley) property. Rather, the court determined agenda item No. 10 was merely authorization to execute a consultant's contract to provide for additional services including completion of the final wetlands mitigation plan.

Finally, the court found the administrative record did not show MTDB approved any new widening of the San Diego River. The court noted the original Project discussed in the EIR includes a diversion channel with a width of 100 to 200 feet and that no final design modifying this plan or widening the river to 70 feet has been developed or approved. The court noted even if MTDB had adopted the proposed widening of the river channel, this change would not be significant enough to require a SEIR because this portion of the river channel is on disturbed land.

RVPP then filed a motion for new trial based on new evidence that (1) the plans to widen the San Diego River were more extensive than previous evidence before the court, and (2) public agencies had recommended against the issuance of development permits in light of potential unacceptable adverse impacts to aquatic resources and the lack of sufficient hydrologic information. The court denied the motion without prejudice to RVPP filing a further challenge on the ground no "final" action had been taken by MTDB with respect to an unanticipated degree of river widening. This appeal followed.

JUDICIAL NOTICE REQUEST

On February 10, 1995, while this appeal was pending, MTDB requested that we take judicial notice of action it took with respect to agenda item No. 30 at its board of directors meeting held on October 6, 1994. MTDB's request for judicial notice was unopposed and granted by us on February 22, 1995.

The records from MTDB's meeting on October 6, 1994, reflect that MTDB (1) approved changes to flood control improvements to delete the

---

[7]The court also noted that as the San Diego River passes through the golf course, it is devoid of most vegetation.

previously approved north side diversion channel and to widen the current Levi-Cushman pilot channel, and (2) approved the conceptual Warner Ranch (River Valley) Mitigation Site Plan.

As part of its reply brief filed on March 2, 1995, RVPP for the first time argues we should not consider MTDB's judicial notice request because the subsequent actions of the agency "cannot retroactively exonerate a prior abuse of discretion" relating to approval of agenda item No. 33.

### SUBSEQUENT PROCEDURAL HISTORY

On November 7, 1994, RVPP filed a second petition for writ of mandate in the superior court, River Valley Preservation Project v. Metropolitan Transit Development Bd. (Super. Ct. San Diego County, No. 682575). This second petition challenged MTDB's October 6, 1994, approval of agenda item No. 30 (the subject of MTDB's request for judicial notice). Both parties agree that RVPP's second petition for writ of mandate involves "identical issues" raised by this appeal based upon a "new but similar record."[8]

### DISCUSSION

A. *Standard of Review*

■ In deciding whether a public agency properly determined a subsequent or supplemental EIR was unnecessary, the standard of review is "whether the [administrative] record as a whole contains substantial evidence to support a determination that the changes in the project [or its circumstances] were not so 'substantial' as to require 'major' modifications to the EIR." (*Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1075 [230 Cal.Rptr. 413], fn. omitted; *Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1318 [8 Cal.Rptr.2d 473]; § 21168.)[9]

The question whether an SEIR is required with respect to a proposed project is governed by section 21166 which provides: "When an environmental impact report has been prepared for a project pursuant to this

---

[8] In MTDB's opening brief, we were informed that the administrative record in RVPP's second petition for writ of mandate will be about 1,000 pages (in addition to the existing 6-volume administrative record and supplemental administrative record). Briefing in this new action was to be completed by May 22, 1995. We take judicial notice that the hearing on the second petition for writ of mandate has not yet been held.

[9] Section 21168 provides: "Any action or proceeding to attack, review, set aside, void or annul a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure. [¶] In any such action, the court shall not

division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."[10] As the court discussed in *Fund for Environmental Defense* v. *County of Orange* (1988) 204 Cal.App.3d 1538, 1544 [252 Cal.Rptr. 79], it is important to understand the distinctions between the requirements for an EIR and those for an SEIR. ■ "An EIR is required in the first instance whenever a project 'may have a significant effect on the environment.' (§ 21151.) On the other hand, [an SEIR] is prepared under section 21166 only where it is necessary to explore the environmental ramifications of a substantial change not considered in the original EIR. (Cal. Code Regs., tit. 14, § 15162, subds. (a)(1) & (2); *Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 265 [citation].)" (*Fund for Environmental Defense* v. *County of Orange, supra,* 204 Cal.App.3d at p. 1544.)

The court then reiterated what was stated in *Bowman* v. *City of Petaluma, supra,* 185 Cal.App.3d at pages 1073-1074: " '[S]ection 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process. Thus, while section 21151 is intended to create a "low threshold requirement for preparation of an EIR" [citation], [section 21166] indicates a quite different intent, namely, to restrict the powers of agencies "by prohibiting [them] from requiring a subsequent or supplemental environmental impact report" unless the stated conditions are met. [Citation.]' (Original italics.)" (*Fund for Environmental Defense* v. *County of Orange, supra,* 204 Cal.App.3d at p. 1544.)

As MTDB points out, our Supreme Court recently addressed this issue in *Laurel Heights Improvement Assn.* v. *Regents of University of California*

---

exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record."

[10]Section 15162, subdivision (a)(1) & (2) of the Guidelines provides in part that a subsequent EIR is not required unless the changes in the project and/or the changes with respect to the circumstances of the project are such that they "will require major revisions of the previous EIR . . . due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects [not covered in a previous EIR]."

(1993) 6 Cal.4th 1112 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*). The court rejected the proposition that there is a statutory duty to prepare a new EIR whenever "*any* new, arguably significant information or data" is proposed, "regardless of whether the information reveals environmental bad news." (*Id.* at p. 1126, italics in original.) The court also recognized that even a substantial increase in the severity of an environmental impact does not require recirculation of an EIR, or the preparation of an SEIR if mitigation measures are adopted which reduce the impact to a level of insignificance.[11] (*Id.* at p. 1130.) The court instructed that "[i]n applying the substantial evidence standard, the reviewing court must resolve reasonable doubt in favor of the administrative finding and decision. [Citation].)" (*Id.* at p. 1135.) As such, ". . . if there are conflicts in the evidence, their resolution is for the agency." (*Sierra Club* v. *County of Sonoma, supra,* 6 Cal.App.4th at p. 1317.)

Our task in this appeal is the same as that of the trial court. We must search the administrative record and determine, in light of the whole record, whether there is substantial evidence supporting the agency's determination and whether the agency abused its discretion by failing to proceed in the manner required by law.[12] (*Fund for Environmental Defense* v. *County of Orange, supra,* 204 Cal.App.3d at p. 1545.)

We do not judge the wisdom of the agency's action in approving the Project or pass upon the correctness of the EIR's environmental conclusions. (*Fund for Environmental Defense* v. *County of Orange, supra,* 204 Cal.App.3d at p. 1545; *City of Fremont* v. *San Francisco Bay Area Rapid Transit Dist.* (1995) 34 Cal.App.4th 1780 [41 Cal.Rptr.2d 157].) Our function is simply to determine whether the agency followed proper procedures and whether there is substantial evidence supporting the agency's determination that the changes in the Project (or its circumstances) were not substantial enough to require an SEIR.

---

[11]The court's limited inquiry is consistent with the principles that the purpose of CEQA is not to generate paper (*A Local & Regional Monitor* v. *City of Los Angeles* (1993) 16 Cal.App.4th 630, 639 [20 Cal.Rptr.2d 228]), nor is CEQA's reporting process designed to freeze the ultimate proposal in the precise mold of the initial project. (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 199 [139 Cal.Rptr. 396].) By passing CEQA "the Legislature did not intend to promote endless rounds of revision and recirculation of EIR's." (*Laurel Heights II, supra,* 6 Cal.4th at p. 1132.)

[12]As such, we are not bound by the factual findings of the trial court in this case. (See 2 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 1995) § 23.112, p. 1020, citing *Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 417 [151 Cal.Rptr. 866] and *Mountain Defense League* v. *Board of Supervisors* (1977) 65 Cal.App.3d 723, 728 [135 Cal.Rptr. 588].)

Having these principles in mind we turn to the challenged decisions of MTDB which RVPP claims are changes to the Project sufficiently significant to warrant preparation of an SEIR.

B. *Agenda Item No. 10*

As we noted previously, MTDB purchased the River Valley Golf Course as a mitigation site for the Project. As part of agenda item No. 10, MTDB's board of directors authorized the general manager to execute contract amendment No. 11 with Boyle Engineering which included authorization to "complete the wetlands mitigation concept plan."

Contract amendment No. 11's total cost was $167,200. Of this amount $16,000 was allocated to the River Valley wetlands mitigation project as follows: "The wetlands mitigation project was originally anticipated to include the entire Warner Ranch purchase, with minor channel improvements and mostly a flat wetland[s] habitat. Changes have occurred which require mitigation plan revisions that include a major channel to keep the 100-year flood within acceptable elevation limits, and available land for sale for future development or future mitigation. The consultant will continue to develop an acceptable plan with the above criteria."

■ RVPP argues that MTDB's commitment to hire Boyle Engineering to submit a wetlands mitigation concept plan required the preparation of an SEIR under section 21166. RVPP claims approval of a "final plan" was not required before further environmental study (SEIR) under CEQA. RVPP cites *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 394-395 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*) for the proposition that a public agency's approval of a project or future portions of a project is not a prerequisite for an EIR under CEQA.

In *Laurel Heights I*, a citizens association challenged the University of California's (University) certification of an EIR for the expansion of the pharmacy school's basic science research units and the creation of a new facility in a residential neighborhood. One of the plaintiff's contentions centered on the scope of the University EIR. Plaintiff argued the EIR did not accurately assess the project's reasonably foreseeable impacts, because the analysis ignored the fact the University intended to expand the research facility within a few years after opening it. (47 Cal.3d at pp. 393-394.) The EIR omitted any discussion of the impacts of the project in its probable ultimate expanded form. The University argued it need not evaluate the effects of future use of the site, because it had not formally approved any expansion of the facility. (*Id.* at p. 394.)

The Supreme Court agreed with plaintiff and held that the EIR should have addressed anticipated future uses of the site and their environmental effects. The court also held that ". . . a public agency's approval of a project or future portions of a project is not a prerequisite for an environmental impact report under CEQA." (47 Cal.3d at p. 395, fn. omitted.)

*Laurel Heights I* clearly has no application to the portion of agenda item No. 10 authorizing Boyle Engineering to submit a wetlands mitigation concept plan for River Valley. By the contract's own terms it would have served no purpose to have required an SEIR to engage in sheer speculation as to future environmental consequences of the mitigation plan which was then unspecified and uncertain.[13] (*Del Mar Terrace Conservancy, Inc.* v. *City Council* (1992) 10 Cal.App.4th 712, 730 [12 Cal.Rptr.2d 785]; *Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 711-712 [270 Cal.Rptr. 650]; *Sacramento Old City Assn.* v. *City Council* (1991) 229 Cal.App.3d 1011, 1025 [280 Cal.Rptr. 478].) In addition, the relatively small cost involved in this portion of contract amendment No. 11 does not support an argument that this was a significant matter.

*Laurel Heights I* involved an attack upon the adequacy of an EIR which is not the issue before us. Here, RVPP asks us to require the preparation of an SEIR pursuant to section 21166. However, in the parlance of the Guildlines, there must be subsequent changes to the project or circumstances surrounding the project which "require major revisions of the previous EIR . . . due to the involvement of new significant environmental impacts not considered in a previous EIR." (Guidelines, § 15162, subd. (a)(1) & (2).)

The administrative record here clearly recognized that new wetlands areas were required to mitigate the impacts from the entire Project. Mitigation measure No. 1 adopted as part of MTDB's approval of the Project required MTDB to prepare a "detailed Mitigation Plan" and "[s]pecific mitigation sites and mitigation acreages will be identified in the permitting process."[14] Although MTDB intends to use the River Valley property to create wetlands

---

[13]As of the date that RVPP filed the lawsuit which is the subject of this appeal, MTDB had done nothing with the Warner Ranch (River Valley) property but authorize its purchase to create new wetlands and contract for the preparation of consultant studies for the site. No final grading or restoration plan had been approved by MTDB for Warner Ranch in November 1993.

[14]The EIR emphasized that as part of the Project, "[a] list of potential mitigation sites along the San Diego River that are appropriate for creating riparian wetlands has been developed by [a consultant] for MTDB." The Warner Ranch site was described in the March 1993 wetlands mitigation plan submitted by MTDB as a 35-acre *potential* mitigation site, currently occupied by a golf course and tennis courts, which would be excavated "from about 1 foot above the water table at the water's edge to about 10 feet above the water table at the perimeter of the

areas for mitigation purposes, this action does not require the preparation of an SEIR where the original EIR (§ 15162) adequately discussed mitigation. (*Sacramento Old City Assn.* v. *City Council, supra,* 229 Cal.App.3d at pp. 1031-1032; *No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223, 237-238 [242 Cal.Rptr. 37].)

We are aware from MTDB's judicial notice request that on October 6, 1994, its board of directors approved the conceptual Warner Ranch Mitigation Site Plan for the Project as part of agenda item No. 30. MTDB found that the agenda item No. 30 changes to the Project did not require an SEIR under section 21166.

As noted, RVPP filed a second petition for writ of mandate in the superior court (River Valley Presenation Project v. Metropolitan Transit Development Bd., *supra,* No. 682575) which challenged MTDB's approval of agenda item No. 30. Nevertheless, in its reply brief RVPP asks us to ignore agenda item No. 30 and adjudicate the merits of this appeal.

The only relevance which agenda item No. 30 has to this appeal is that it demonstrated that agenda item No. 10 approved on November 18, 1993, was not a final action by MTDB as to the Warner Ranch mitigation site. We are not deciding whether MTDB was correct in finding agenda item No. 30 did not require the preparation of an SEIR. This is the subject of RVPP's second petition for writ of mandate. In the event we are later asked to decide that question on a full record (see fn. 8, *ante*) we shall do so. However, an SEIR was not required as a result of MTDB's approval of agenda item No. 10 as it relates to contract amendment No. 11 with Boyle Engineering to complete a wetlands mitigation concept plan.[15]

## C. *Resolution No. 93-34 and Agenda Item No. 33*

The heart of RVPP's appeal centers around MTDB's decision to raise the elevation of the berm through the Levi-Cushman property after certification

---

mitigation area." As MTDB Boardmember and San Diego City Councilwoman Valerie Stallings stressed at the August 12, 1993, meeting, Warner Ranch is only being purchased by MTDB to *create* new wetlands, not to build the LRT or destroy any existing wetlands area: "[M]y understanding is that the land that is going to be used for mitigation [Warner Ranch] is now currently a golf course. . . . [W]e were talking about replacing that with natural habitat, with the kind of the environment that is the river really, rather than a golf course."

[15]We cannot find support for RVPP's position that agenda item No. 10 warrants the preparation of an SEIR because it allegedly constitutes a course of action to approve a "100 year flood channel." While some reference is made to a major channel to keep the 100-year flood within acceptable elevation limits in the discussion of contract amendment No. 11, that was not the focus of agenda item No. 10.

of the EIR. In both the draft and final EIR, the Levi-Cushman segment of the Project was to be constructed through the Stardust Golf Course. The EIR states that "[i]f the [Project] is constructed prior to the development of the Levi-Cushman property, the [Project] would be constructed on an 8- to 10-foot berm."[16] The berm for this elevation was expected to have a steep two-to-one slope (horizontal to vertical) and extend for three thousand eight hundred feet without the benefit of flood control and other improvements that would eventually be provided by the Levi-Cushman development. The berm was expected to be at the anticipated elevation of any development of the property. When Chevron develops the property, "the area will be filled to the elevation of the berm, and the developer will be responsible for providing full 100-year flood protection . . . ."

On May 14, 1992, MTDB certified and approved the final EIR. Between October 1992 and July 1993, MTDB wrestled with the problem that the Project through the Levi-Cushman property would likely occur before Chevron proceeded with the RiverWalk Development. At one point, the executive committee for MTDB recommended that the design of the Project across the Levi-Cushman property be temporarily suspended until the RiverWalk Development schedule was resolved.

In mid-1993 Chevron informed MTDB that it would not proceed with its project for at least five years. On August 12, 1993, MTDB approved Resolution 93-34 which included a revision to the alignment through the Levi-Cushman segment providing a temporary alignment to the north (adjacent to Friars Road) pending development of the area. The temporary north alignment would avoid the need for the payment of costly flood control improvements and construction of the berm prior to the RiverWalk Development.

Resolution No. 93-34 also contained a revision of the permanent alignment of the Project through the Levi-Cushman segment to where it was located in the original EIR. MTDB further decided the approved permanent

---

[16]In the hydrology section of the EIR it was noted that the tracks of the preferred alignment for the Project would, for the most part, be outside of areas subject to inundation by a 100-year flood either by virtue of location or elevation to which the tracks would be raised. Segments which would be within the 100-year-floodplain boundaries would typically be raised on elevated structures (columns). However, the Levi-Cushman segment, a roughly one-mile reach of the San Diego River downstream of Fashion Valley Road, would be partially within the floodplain and would be built on an eight- to ten-foot berm rather than a structure to clear the floodplain. Construction of this segment could affect flood flows because the berm would decrease the area available for flood flows to spread. The berm would be used because surrounding land would eventually be graded to the same height for development.

alignment would have to be on a revised berm 20 to 30 feet above existing ground level to match the grade level contained in the revised Chevron development plans to place the Project above the 100-year-flood level.[17]

In November 1993 MTDB staff decided that the alternative north alignment would not result in substantial cost savings. By agenda item No. 33, MTDB voted to (1) delete the temporary (north) alignment alternative approved in August 1993, (2) reconfirm the board-adopted Project alignment be utilized through the Levi-Cushman property, and (3) direct the staff to proceed with the final design on the adopted alignment.[18]

█ RVPP's argument for an SEIR relates to the addendum to the EIR and agenda item No. 33, which called for the Project to be built on a 20- to 30-foot berm in order to be at grade with future Chevron development. In addition to the increased height of the berm, RVPP tells us the former slope of two to one will be changed to four to one which makes the volume of fill to be placed in the floodway even more significant.[19] RVPP takes the position that the change in height and slope of the berm will result in a dramatic increase in the amount of fill to be placed in the floodway and would decrease the area available for flood flows to spread.

RVPP believes that the increase in the size and slope for the berm will necessitate costly flood control improvements not considered in the EIR or when agenda item No. 33 was approved. Specifically, RVPP claims that to offset the amount of fill planned for the 20- to 30-foot berm, a major 100-year-flood channel through the River Valley property and a widening of the San Diego River through the Stardust Golf Course is planned. RVPP

---

[17]At the board of director's meeting on August 12, 1993, in discussing the temporary (north) alignment, it was noted the alignment would have impacts on cultural resources and mitigation measures identified in the EIR would have to be followed. Further, the board of directors was informed that Chevron opposed the temporary alignment because it planned its initial development adjacent to Friars Road (above the 100-year floodplain) and the temporary alignment would create more golf course impacts than the adopted alignment.

[18]MTDB staff prepared a capital cost comparison between the adopted alignment and the alternative north alignment, concluding that the adopted alignment was $865,000 less expensive. In the comparison it was stated that flood control would cost $630,000 for the adopted alignment as opposed to $70,000 for the alternative (north) alignment.

[19]In our review of the administrative record, the only reference to the new four-to-one slope for the berm is a recommendation from golf course architect Ted Robinson who was consulted about maintaining 27 holes of golf while the Project is constructed. Robinson believed that four-to-one slopes could be covered with grass and incorporated into the golf course and would limit the impact of the Project on the golf course to only a thirty-five-foot-wide right-of-way. We do not know whether his recommendation was adopted by MTDB. However, MTDB's brief does discuss the change to the four-to-one slope as part of the revised berm and counsel for MTDB conceded this slope change at oral argument.

concludes that the excavation and dredging of materials from the San Diego River to build the berm "is a completely new impact to the aquatic resources of the San Diego River environment." These substantial changes, RVPP argues, should require MTDB to prepare an SEIR as required by *Bowman v. City of Petaluma, supra,* 185 Cal.App.3d at page 1075 and Guidelines, section 15162, subdivision (a)(1).

MTDB maintains that the modified berm and slope do not produce any unforeseen significant adverse environmental impacts that were not raised, analyzed or discussed in the original EIR. (See *Fund for Environmental Defense v. County of Orange, supra,* 204 Cal.App.3d at p. 1550.) The EIR prepared for the Project clearly recognized the then proposed eight- to ten-foot berm could affect the flood flows because the berm would decrease the area available for flood flows to spread.

The hydrology section of the EIR contained an extensive study of the flood control aspects of this berm and Project alignment across the Levi-Cushman property. The analysis determined that any design must allow for the overall passage of 49,000 cubic feet per second of water through the area to prevent "any incremental increase in flood elevation . . . ."[20] As part of the Project design, a "floodway" channel was included to allow for better passage of flood control waters, incorporating "4:1 side slopes on the north bank of the channel, and bottom widths ranging from 100 to 200 feet."[21] Several public comments about this "substantial flood channel," included in the Project as approved by MTDB in 1992, are in the EIR. The hydrology report concluded that with these mitigation measures incorporated into the Project, 100-year water-surface elevations would not increase when the berm is in place. Therefore, impacts due to changes in surface water flood patterns would not be significant.

MTDB admits that Chevron's revised plans for the RiverWalk Development dictated the approval of Resolution 93-34 and agenda item No. 33 and a revised berm with some areas elevated 20 to 30 feet above existing grade (10 to 20 feet higher than described in the EIR). MTDB further agrees that in considering the increase in elevation, "[s]ome flood control work [would] be

---

[20]The analysis of 100-year flooding was based on updated flow rates developed by using an HEC-2 Water Surface Profiles computer system and a 1985 Army Corps of Engineers hydrology report for Mission Valley rather than older flood insurance studies previously prepared for the City of San Diego.

[21]The hydrology report also proposed a diversion dike be constructed at the eastern end of the berm to help divert floodwaters to the proposed channel. Limited modifications were proposed for an approximately 500-foot reach of the river by adjusting the south side slope and increasing the bottom width by 5 feet.

needed." The question which we must decide is whether the height increases and slope changes in the berm created substantial environmental ramifications that will require major revisions of the EIR. (§ 21166; Guidelines, § 15162, subd. (a)(1) & (2).)

Preliminarily, we note the entire Project provides for a 6.2-mile extension of the Project through Mission Valley to the vicinity of San Diego Jack Murphy Stadium. The entire draft EIR prepared in November 1991, including appendices, is approximately 500 pages.[22] The hydrology section relating to the Levi-Cushman segment previously discussed covers at most 10 pages of the EIR. The approximate length of the Levi-Cushman segment in which the berm is to be elevated is at most 3,800 feet. The extremely limited area of the Project which would be the subject of an SEIR is a factor dictating against one. By virtue of the proportionate size of the area at issue to the remainder of the Project, the modifications would not create a substantial adverse environmental impact nor would they require a major revision of the original EIR.[23]

RVPP argues that to offset the amount of fill planned to construct the 20- to 30-foot berm, a major flood channel through the River Valley property and a $630,000 widening of the San Diego River through the Stardust Golf Course is now contemplated by MTDB. The administrative record does establish, as we already discussed, that MTDB approved a flood control channel across the Stardust Golf Course as part of the Project which was analyzed in the EIR. However, we agree with MTDB that agenda item No. 10 did not constitute a course of action to approve a 100-year-flood channel across the River Valley property. (*Ante*, fn. 15.)

Similarly, we disagree with RVPP's claim that MTDB approved a widening of the San Diego River for approximately a three-quarter mile stretch through the Stardust Golf Course as part of agenda item No. 33. RVPP has taken the following statement from the board of directors' November 18, 1993, meeting out of context: "For the adopted alignment, the bottom of the river channel through the Levi-Cushman property would have to be widened to 70 feet, at a cost of $630,000."

[22] Section 15141 of the Guidelines states that for "proposals of unusual scope or complexity" the text of the EIR should "normally be less than 300 pages."

[23] We recognize that the size of a proposed project alone is not determinative of whether a public agency must prepare an EIR in the first instance or whether an SEIR may be required. Nevertheless, when deciding whether the addition of new information to an EIR is "significant" or has a substantial adverse environmental impact on a project, the particular area under consideration in relation to the entire project becomes a factor to consider. Presumably, MTDB considered the limited area challenged in deciding no SEIR was required.

This statement apparently refers to MTDB's cost comparison between the board-adopted alignment and the temporary (north) alternative alignment which we already discussed. (See *ante*, pp. 162-163.) The cost of $630,000 for the board-adopted alignment included the flood control measures contemplated when the EIR was approved (i.e., diversion flood channel, diversion dikes and river modifications) with an eight- to ten-foot berm.

We are unable to explain what is meant by the reference to widening the river channel to 70 feet. MTDB's explanation that the EIR envisioned a flood control channel with a width of 100 to 200 feet which can now be reduced to 70 feet makes no sense to us in light of MTDB's concession that additional flood control measures were needed to compensate for the new berm elevation.

The EIR did provide for an increase in the bottom width of the river from 70 to 75 feet over a 500-foot stretch of the river. Because we cannot find any other corroboration in the record to support the river channel widening to 70 feet, we choose to disregard it.[24] (*Laurel Heights I, supra*, 47 Cal.3d at p. 393 [court must resolve reasonable doubts in favor of administrative finding and decision].)

Our case is similar to *Fund for Environmental Defense* v. *County of Orange, supra*, 204 Cal.App.3d at page 1550 in which the petitioners sought a conditional use permit that would allow the development of a medical research laboratory complex on property surrounded by a wilderness park. A previously approved use permit, for which an EIR had been prepared, had lapsed. In arguing for the need for a supplemental or subsequent EIR, the petitioners emphasized that the circumstances surrounding the project area had changed since the preparation of the original EIR in that the adjacent wilderness park, which formerly had bounded the site on only one side, now completely surrounded the project. This fact, however, did not persuade the court of the need for a subsequent or supplemental EIR. (204 Cal.App.3d at pp. 1550-1552.)

The court noted that "at first blush, . . . [¶] [t]he bald fact that a project is suddenly surrounded by a wilderness park does sound like a substantial change. However, the record clearly demonstrates the change raises no new adverse effects that were not raised, analyzed and discussed in the original EIR. *The effects are all matters of degree.* Problems that had already been

---

[24]Having done so, we need not discuss MTDB's position that a widening of the river channel would be an environmental benefit by creating additional wetlands and improving flood control and hydrology.

analyzed and reviewed were expanded or increased by a change in circumstances. But the record supports a finding that the increase in effects was not 'cumulatively considerable' (Guidelines, § 15065, subd. (c)) and hence deserving of a mandatory significant effect." (204 Cal.App.3d at p. 1550; italics added.)

Similarly here, MTDB in the original EIR carefully reviewed, discussed and analyzed the effects of flood flows from the use of elevated berms (at eight to ten feet) including mitigation measures. Subsequently, Chevron's development plans for the RiverWalk Development were revised to cause MTDB to approve an increase in the height of the berms to approximately 20 to 30 feet. The change in circumstances here does not raise any new effects which the EIR had not already reviewed and analyzed. Although the increased height and dimension of the berm will increase the flood flow, the degree of that change has not been shown to reach the "watermark" of substantial environmental ramifications to dictate major revisions to the EIR and cause the preparation of an SEIR.[25]

On August 12, 1993, in Resolution No. 93-34, as an addendum to the EIR,[26] MTDB found that the modifications of the Project (including the revised berm) will not have any significant environmental effects and no SEIR is required. RVPP argues the addendum is a mere summary of conclusions which is supported with nothing but self-serving statements and no evidence that there will be reduced impacts.

We do not agree with this assessment of the record. As of August 12, 1993, MTDB still had under active consideration the use of the temporary (north) alignment toward Friars Road which was discussed at its meeting. In addition, "[n]othing in the Code or the Guidelines suggests that new findings are required when an addendum is prepared. Here, the 'unavoidable adverse impacts' described in the addendum are the same as those described in the original EIR." (*Fund for Environmental Defense* v. *County of Orange, supra,* 204 Cal.App.3d at p. 1553; *Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1034-1035 [185 Cal.Rptr. 41].)

---

[25]We note MTDB has purchased a right-of-way through the Stardust Golf Course. MTDB, having no control over Chevron's decision with respect to the RiverWalk Development, must nevertheless adjust its plans to the change in Chevron's plans. If a threat of flooding or violation of CEQA exists, we question why Chevron, as owner of the property, has not objected.

[26]Section 15164 of the Guidelines provides: "(a) The lead agency or a responsible agency shall prepare an addendum to a previously certified EIR if some changes or additions are necessary but none if the conditions described in Section 15162 calling for preparation for a subsequent EIR have occurred."

At the November 18, 1993, meeting when agenda item No. 33 was passed, MTDB was advised that staff was concerned that placing the amount of fill (for the revised berm) would impact the hydraulic capacity of the San Diego River. A hydraulic analysis of the river through the Levi-Cushman and Warner Ranch properties has been conducted. Using the hydraulic program, different river channel configurations were evaluated until the water elevation showed no increase. In addition, MTDB was able to hear public testimony with respect to agenda item No. 33 including that of a representative from RVPP. MTDB was not presented with any evidence that the revised berm would produce new or unanalyzed flood control impacts.[27] (*Ibid.*)

These facts show that both MTDB and the public have continuously been aware of flood flow problems in the Levi-Cushman segment occasioned by the use of an elevated berm to support the Project. The EIR adequately reviewed, analyzed and discussed this problem and prepared mitigation measures to eliminate the increased water flow. The circumstances which resulted from the revised Chevron development and modified berm received similar attention. ■ As we have stated previously, "[o]ur limited function is consistent with the principle that " ' "[t]he purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. . . ." ' " (*City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1448 [263 Cal.Rptr. 340]; quoting *Laurel Heights I, supra,* 47 Cal.3d at p. 393.) "We look 'not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' (Guidelines, § 15151.)" (*City of Fremont* v. *San Francisco Bay Area Rapid Transit Dist., supra,* 34 Cal.App.4th at p. 1786.)

■ We are also mindful that in the case of a certified EIR, section 21167.2 mandates the EIR be conclusively presumed valid. This presumption acts to preclude reopening of the CEQA process even if the initial EIR is discovered to have been fundamentally inaccurate and misleading in the description of a significant effect or the severity of its consequences. (*Laurel Heights II, supra,* 6 Cal.4th at p. 1130.)[28] ■ In applying these CEQA principles and the substantial evidence standard of review, we conclude MTDB correctly rejected RVPP's request to prepare an SEIR based on approval of Resolution 93-34 and agenda item No. 33 relating to approval of a 20- to 30-foot berm and slope change to the Project alignment in the Levi-Cushman segment.

---

[27]MTDB was told of additional mitigation efforts of providing drains and culverts underneath the Project to be used by golfers and for water drainage.

[28]After certification, the interests of finality are favored over the policy of encouraging public comment. (*Laurel Heights II, supra,* 6 Cal.4th at p. 1130.)

## RVPP's Other Contentions of Adverse Impacts

We believe RVPP's remaining contentions of adverse impacts from the revised berm merit little discussion.

The visual impacts section of the EIR determined the eight- to ten-foot berm elevation would not cause an adverse visual impact, so long as the berm was "properly landscaped" and surrounding areas were maintained as a golf course. MTDB adopted specific mitigation measures to provide for this landscaping and golf course maintenance. No further visual study was necessary because the height increase was minimal and approved by the architect retained to redesign the Stardust Golf Course.

The land-use impact occasioned by the purchase and loss of the River Valley Golf Course is offset by its use as a mitigation site for the Project. Further, this land-use impact is part of RVPP's second petition of writ of mandate, an issue not presently before us.

The EIR found that the Project would result in the overall loss of "6.44 acres" of wetlands before any mitigation efforts. The EIR further found there would be no wetlands impacts in the Levi-Cushman segment because the Project alignment and planned flood control channel would both run through the golf course. We disagree with RVPP's claim that an additional 11 acres of wetlands have been impacted through the River Valley property and Stardust Golf Course.[29]

Finally, since we do not agree that the administrative record supports RVPP's claim that MTDB intends to widen the San Diego River by 70 feet for approximately three-quarters of a mile, we cannot conclude there will result a substantial impact on biological resources or wildlife.

Accordingly, we reject RVPP's position that Resolution No. 93-34 or agenda item No. 33 has caused additional substantial environmental impacts,

---

[29]RVPP cites to the administrative record for the proposition that "open water [w]etlands habitat . . . totals 11 acres in the Stardust [Levi-Cushman] and River Valley [Warner Ranch] [properties]." This citation is to the city's 1985 Mission Valley Community Plan, which contains generalized habitat maps for Mission Valley. These 1985 maps provide no support for the claim that MTDB has somehow changed its plans since 1992 to wipe out the total wetlands in this area. MTDB prepared an updated and much more specific survey of wetlands in its EIR.

either individually or collectively, so as to require major revisions to the EIR and require a SEIR.[30]

## COSTS FOR PREPARING ADMINISTRATIVE RECORD

RVPP contends the court erred in including, as part of the cost of preparing the administrative record, labor costs of MTDB's employees for time spent collecting and indexing the record. RVPP asserts (1) the fees and costs provision of section 21167.6, subdivision (b) does not cover items, such as hourly wages, not expressly fixed by law, (2) both the legislative intent and public policy dictate that labor costs should be excluded from administrative record preparation, and (3) the excessive labor costs here were not necessarily incurred or reasonable.

Under section 21167.6, subdivision (a),[31] RVPP requested MTDB to prepare the administrative record. MTDB prepared a record contained in 6 volumes consisting of nearly 4,000 pages of documents spanning 10 years, for a total cost of $10,194.05. RVPP then brought a motion to determine costs of preparing the administrative record, arguing allowable costs included only those for actual photocopying and transcription. After hearing, the court found "[a]ll the costs claimed by [MTDB] were necessarily incurred and are reasonable. Specifically, the [c]ourt finds that it was reasonably necessary for [MTDB] to utilize the services of [an] engineer . . . and

---

[30]We likewise are unpersuaded by the case authority relied on by RVPP in support of its position that an SEIR was required in this case. *Mira Monte Homeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357 [212 Cal.Rptr. 127] involved an attack on the adequacy of an EIR before certification and a previously unidentified encroachment on wetlands not discussed in the EIR. In addition, the court never applied the substantial evidence standard of review in reaching its decision. (*Bowman* v. *City of Petaluma, supra,* 185 Cal.App.3d at p. 1075.) In *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929 [231 Cal.Rptr. 748, 727 P.2d 1029], the primary issue was whether the citizens group's cause of action was barred by the applicable limitations period. (§ 21167.) The Supreme Court's statement that " '[i]t cannot be doubted that some of the changes allegedly made in the project [an amphitheater] . . . [are] substantial enough to require the [agency] to file a subsequent EIR to assess their environmental effects' " was made in reviewing the sustaining of a demurrer. As such, this language has been recognized as dicta rather than the court's holding. (*Fund for Environmental Defense* v. *County of Orange, supra,* 204 Cal.App.3d at pp. 1549-1550.)

[31]That section provides in part: "At the time that the action or proceeding is filed, the plaintiff or petitioner shall file a request that the respondent public agency prepare the record of proceedings relating to the subject of the action or proceeding. . . ." (§ 21167.6, subd. (a).) The agency has 60 days from the date the request is served to prepare and certify the administrative record. (§ 21167.6, subd. (b)(1).) RVPP, as the petitioner, had the option of preparing the administrative record itself to minimize expenses. (§ 21167.6, subd. (b)(2); see *Citizens for Quality Growth* v. *City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 447, fn. 11 [243 Cal.Rptr. 727].)

paralegal . . . to review, organize, and index the administrative record, and that the costs claimed by [MTDB] for these services [are] reasonable."

■ Whether a particular cost to prepare an administrative record was necessary and reasonable is an issue for the sound discretion of the trial court. (*Marlow* v. *Orange County Human Services Agency* (1980) 110 Cal.App.3d 290, 294 [167 Cal.Rptr. 776]; *Ladas* v. *California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774 [23 Cal.Rptr.2d 810].) Discretion is abused only when, in its exercise, the court "exceeds the bounds of reason, all of the circumstances being considered." (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 566 [86 Cal.Rptr. 65, 468 P.2d 193].) The appellant has the burden of establishing an abuse of discretion. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 331 [216 Cal.Rptr. 718, 703 P.2d 58].)

■ Here, the court expressly found the cost of preparing the administrative record was both necessarily incurred and reasonable. The record from that hearing shows MTDB did not have support staff available to review the files or assemble the administrative record. One of MTDB's assistant transportation engineers was the staff person most familiar with the Project. He reviewed and compiled the documents that comprised the administrative record, reflecting the entire factual record of the Project dating back more than 10 years. He spent 102 hours over a 4-week period at an hourly rate of $74.24. The paralegal assigned to the case assisted the engineer with the review of documents and assembly of the administrative record in an effort to meet the 60-day deadline. She spent 35 hours, not including certain time that overlapped with the engineer's time, preparing the record at a rate of $90 per hour.

The history and complexity of this case required a complete, organized and adequately indexed administrative record for the court's proper review, necessitating the expense of physical and organizational skills to accomplish this result. MTDB was entitled to select the appropriate personnel to perform the particular task. Having done so, it was then for the trial court to determine whether the costs were necessarily incurred and reasonable. Under these circumstances, we cannot say the court exceeded the bounds of reason in finding it was reasonably necessary for persons with specialized knowledge to prepare this administrative record. Moreover, the hourly rates charged were not exorbitant and the total cost spent was proportionate to the extensive record here. Thus, the court acted well within its discretion in finding costs claimed by MTDB were reasonable. (Cf. *Citizens for Quality Growth* v. *City of Mt. Shasta, supra,* 198 Cal.App.3d at pp. 447-448 [court

failed to find it was necessary for experts to prepare record and that amount was reasonable].)

RVPP contends section 21167.6, subdivision (b)(1) allows reimbursement for only those costs "in conformance with any law or rule of court." RVPP argues no express policy or law exists for the recovery of costs for time spent by MTDB's own employees (i.e., labor costs in the form of wages and lost time) in preparing the administrative record. However, we do not interpret section 21167.6, subdivision (b)(1) requiring payment of "any costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court" to exclude staff labor costs simply because no law or rule of court specifies such costs. Rather, a commonsense reading of section 21167.6, subdivision (b)(1) requires time spent to prepare the record be included. An interpretation such as that urged by RVPP allowing reimbursement for only photocopying and transcription costs would defeat the purpose of the statute by shifting the financial burden to the public agency preparing the record. Indeed, RVPP had the option of itself preparing the record (§ 21167.6, subd. (b)(2)) and had it believed the services of knowledgeable and experienced personnel were unnecessary, it could have made that election.

RVPP's public policy argument is likewise without merit. RVPP contends allowing indiscriminate labor charges as part of the cost of preparing the administrative record with respect to a controversial public project would deter challenges to government decisions through administrative and legal channels. However, a similar public policy argument could be made that taxpayers and public transportation users should not have to bear the cost of preparing the administrative record in a lawsuit brought by a private individual or entity. The Legislature has determined the petitioner or plaintiff in an action against a public agency has the option of requesting the public agency to prepare the administrative record (§ 21167.6, subd. (a)) or preparing the record itself (§ 21167.6, subd. (b)(2).)[32] If the petitioner elects to have the public agency prepare the administrative record and believes the costs are inappropriate, that determination is for the trial court in the first instance to make. Here, the trial court made this determination and properly awarded MTDB its costs of preparing the administrative record.

---

[32]The parties may also agree to an alternative method of preparing the administrative record. (§ 21167.6, subd. (b)(2).)

## DISPOSITION

The orders are affirmed.

Benke, Acting P. J., and Froehlich, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 1, 1995. Mosk, J., was of the opinion that the petition should be granted.