[No. H024841. Sixth Dist. Dec. 18, 2003.]

SANTA TERESA CITIZEN ACTION GROUP et al., Plaintiffs and Appellants, v.
CITY OF SAN JOSE et al., Defendants and Respondents;
SANTA CLARA VALLEY WATER DISTRICT et al., Real Parties in Interest and Respondents.

690

COUNSEL

Stephan C. Volker and Gretchen E. Dent for Plaintiffs and Appellants.

Richard Doyle, City Attorney, George Rios, Assistant City Attorney, Joseph P. Diciuccio and Brian C. Hopper, Deputy City Attorneys, for Defendants and Respondents.

William M. Chamberlain, Richard C. Ratliff and Kerry Willis for California Energy Commission as Amicus Curiae on behalf of Defendants and Respondents.

Roger Beers, Anthony Bennetti and Emily J. Cote for Real Party in Interest and Respondent Santa Clara Valley Water District.

Stoel Rives, Anne E. Mudge, Christine W. Griffith, Christian L. Marsh; Realty Law, Joan R. Gallo and Joseph Karnes for Real Party in Interest and Respondent Calpine Corporation.

OPINION

PREMO, J.—Great Oaks Water Company (Great Oaks) and Santa Teresa Citizen Action Group (collectively petitioners) appeal from an adverse judgment on their petition for writ of mandate and complaint for declaratory and injunctive relief. Petitioners challenge a decision by respondents, City of San Jose and the City Council of the City of San Jose (collectively, City) approving the extension of an existing water recycling program to North Coyote Valley. Petitioners argue that in approving the extension, City violated the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)[1] Petitioners also argue that extension of the recycled water program is inconsistent with City's general plan, threatens to be a nuisance, and offends the public trust doctrine. We conclude that City's action was consistent with CEQA's requirements. We shall reject petitioners' additional contentions and affirm the judgment.

## I. FACTS

### A. *The Recycled Water Program*

The impetus to develop a recycled water program came from the San Francisco Bay Regional Water Quality Control Board (RWQCB). By the late 1980's, freshwater discharge from City's sewage treatment facilities was destroying the saltwater habitat of endangered species along the edge of San Francisco Bay. RWQCB ordered City to reduce its discharge of fresh water.

---

[1] All further undesignated statutory references are to the Public Resources Code.

In response City participated in the creation of the San Jose Nonpotable Reclamation Project, now known as the South Bay Water Recycling Program (the Project). Instead of discharging wastewater into the bay, the Project proposed to treat some of it and use it for irrigation and other appropriate purposes.[2] The Project contemplated a waste treatment facility and pipeline system within what is known as the "Golden Triangle," an area encompassing parts of the cities of San Jose, Milpitas, and Santa Clara. Future expansion beyond the Golden Triangle was part of the plan. City certified a final environmental impact report for the Project in 1993 (the FEIR).

The one concern relating to the use of nonpotable water that is central to petitioners' appeal is the concern that substances in the water that make it unfit to drink could find their way into the drinking water supplies. The FEIR addresses that concern. The FEIR evaluates the Golden Triangle portion of the Project at "project level" and the future expansion of the Project at "program level." (See Guidelines, § 15168.)[3] The program portion of the FEIR describes the groundwater aquifers within the entire program area. In the central portion of the groundwater basin where the Golden Triangle is located, the upper and lower aquifers are separated by a nearly impermeable layer referred to as the aquitard. The aquitard helps prevent water on the surface from seeping down and getting into the lower aquifer, which is the aquifer used for drinking water. Around the edge of the groundwater basin the aquitard is discontinuous. Without the protection of an aquitard, surface water passes more easily into the groundwater. The FEIR recognizes that infiltration of recycled water in the Golden Triangle area is particularly unlikely because the aquifer in that area is protected by the aquitard and also because the Golden Triangle has low rates of groundwater infiltration generally. Referring to the areas into which the Project was to be expanded, the FEIR recognizes that in some of those areas the aquifer is unconfined by an aquitard and is thus more vulnerable to degradation from surface water.

To mitigate the Project's potential impact on the aquifer the FEIR requires recycled water quality and use to conform to all standards and guidelines set by the pertinent federal, state, and local agencies. Title 22 of the California

---

[2] Since the Project was first proposed the Legislature has declared that it is in the public interest to encourage the development of facilities to recycle water to supplement existing surface and underground water supplies. (Water Code, § 13510.)

[3] References to Guidelines are to the administrative guidelines for implementation of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

Guidelines section 15168, subdivision (a) permits the use of a program environmental impact report (EIR) when a project consists of "a series of actions that can be characterized as one large project" and are related either: "(1) Geographically, [¶] (2) As logical parts in the chain of contemplated actions, [¶] (3) In connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) As individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways."

Code of Regulations contains Department of Health Services (DHS) guidelines for the design, operation, and monitoring of recycled water programs. (Cal. Code Regs., tit. 22, § 60301 et seq.) RWQCB establishes general guidelines for irrigating with recycled water. (Cal. Code Regs., tit. 23, § 490 et seq.) Real party in interest, Santa Clara Valley Water District (SCVWD) establishes standards for irrigation rates and timing within the program area, conducts baseline groundwater quality studies, and monitors groundwater quality. City and SCVWD are jointly responsible for mitigation. All use of recycled water is subject to review and approval by City and DHS. City and DHS review customers' plans for recycled water on a case-by-case basis. Any particular use is allowed only upon completion of these reviews and issuance of a permit. If degradation were ever detected, use of the recycled water would be modified.

The FEIR goes on to explain that groundwater impacts in the expansion areas would be "similar to construction and operation of the project in the Golden Triangle area and vicinity. Although the lower aquifer in portions of the expansion area is unconfined, expected reclaimed water quality and application rates would still afford adequate groundwater protection." DHS guidelines pertaining to the quality and use of recycled water "establish a conservative approach to protect groundwater in areas where shallow, unconfined aquifers could be affected by excessive infiltration of reclaimed water."

The FEIR concludes: "Given the required level of treatment for reclaimed water, the operational safeguards required by the [DHS] and RWQCB, and the physical characteristics of the aquifer in the project area *neither the proposed project nor other future nonpotable reclamation projects* would be expected to contribute significantly to groundwater degradation . . . . However, groundwater impacts of any future reclamation project would need to be evaluated to determine if groundwater degradation would result." (Italics added.)

## B. *Calpine's Application to Build a Power Plant*

In 1999, real party in interest Calpine Corporation (Calpine) applied to the California Energy Commission (CEC) for approval to build a 600-megawatt natural-gas-fired electric generating facility in North Coyote Valley, south of the Golden Triangle. The proposed Metcalf Energy Center (MEC) was the subject of a lengthy and contentious public debate. The CEC ultimately issued a license for its construction.[4] One of the conditions of that license is

---

[4] Both petitioners objected to MEC and unsuccessfully appealed the CEC's decision. (See *Santa Teresa Citizen Action Group v. State Energy Resources Conservation & Development Com.* (2003) 105 Cal.App.4th 1441 [130 Cal.Rptr.2d 392].)

that MEC use recycled water rather than potable water in its closed cooling system. The CEC's environmental assessment analyzed the impact of using recycled water for that purpose and concluded that it presented no significant environmental impacts.

At the time the CEC approved the MEC project, City's Municipal Water System Division was the only retailer of recycled water in the area. Great Oaks had been willing to build a pipeline to deliver recycled water to serve MEC, but it did not have the licenses and other approvals in place to do so.[5] City was eventually identified as the primary supplier of recycled water for MEC.

### C. City's Approval of the Silver Creek Alignment

The Project was designed at the outset to be expanded in phases. Phase 1 was primarily a build-out of the Golden Triangle project. Phase 2 planned to extend the Project in several directions. Of interest here is the Via del Oro extension that would have extended the Project into the southernmost portion of the original program area and somewhat beyond, terminating around the site proposed for MEC in North Coyote Valley.

An initial study for the phase 2 expansion was completed in May 2000. This study presumed that recycled water would be used for landscape and agricultural irrigation in the expansion areas. The study determined that the impact of such use upon the groundwater was not significant in light of a specified mitigation and monitoring plan. The study stressed that additional monitoring would be conducted in areas with unconfined aquifers. The phase 2 initial study resulted in a negative declaration adopted on July 12, 2000.

City considered the delivery of recycled water to MEC at three city council meetings in 2001. At the two meetings held in June, City discussed using the Via del Oro route and debated about the size of the pipeline. An alternate route, the Silver Creek alignment, was proposed in July 2001. The new route ran parallel to and just east of the Via del Oro route. The proposal was to build approximately nine miles of 30-inch pipe along the new route. Thirty-inch pipe has a capacity of 15 million gallons per day (mgd). Since MEC's peak usage was expected to be no more than 5 mgd, the new pipeline could carry 10 mgd that could be used by then unidentified new customers along the Silver Creek route and further south.

---

[5] In order to serve MEC with recycled water Great Oaks would have had to obtain permission from the Public Utilities Commission to extend its service area to the MEC site, obtain a license to sell recycled water, and reach an agreement with the Project to buy recycled water, since Great Oaks had no facilities of its own to produce it.

The initial study evaluating the new route was conducted in August 2001. This study recognized that the FEIR and the phase 2 initial study had evaluated the environmental impact of irrigating with recycled water in North Coyote Valley. The study pointed out that the use of water for irrigation along the Silver Creek alignment would comply with previously identified mitigation measures, including the requirement that a groundwater monitoring and mitigation plan be developed specifically for the phase 2 area. The initial study found that implementation of those mitigation measures would reduce the groundwater impact to less than significant.

City adopted the 2001 initial study by an addendum to the FEIR dated September 5, 2001, noting, "[a] subsequent EIR will not be prepared because the project described in this addendum does not involve new significant environmental effects or a substantial increase in the severity of previously identified significant effects." City then entered into an agreement with Calpine to build the new pipeline.

## II. PROCEDURAL BACKGROUND

City filed a notice of determination on November 13, 2001, stating that City had approved an agreement between it and Calpine "to allow a 30-pipeline pipeline [*sic*] in the Silver Creek Alignment" and a financing plan for "the South Bay Water Recycling Silver Creek Alignment to provide recycled water to Metcalf Energy Center and other potential users along the new alignment."

Petitioners filed a timely petition for writ of mandate and complaint for declaratory and injunctive relief. The lawsuit sought to set aside City's action as a violation of CEQA and as an abuse of discretion outside the CEQA context. Petitioners also sought an injunction under theories of public nuisance and violation of the public trust doctrine. Petitioners submitted a declaration from Great Oaks Chairman, John Roeder, in which he expressed his concern that the Project's extension to North Coyote Valley would degrade the underlying aquifer. He said that he had privately obtained a test of the Project's recycled water and that the results showed levels of NDMA and THM in excess of drinking water standards.[6]

City and real parties in interest (collectively, respondents) objected to the Roeder declaration on the grounds that it was hearsay and that it was outside the administrative record. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559 [38 Cal.Rptr.2d 139, 888 P.2d 1268] (*Western States*).) Respondents submitted their own expert declarations contradicting Roeder.

---

[6] THM stands for trihalomethane and NDMA is short for N-nitrosodimethylamine.

Petitioners' reply included another Roeder declaration, the declaration of Robert Curry, Ph.D., and other declarations controverting the assertions contained in respondents' declarations. Respondents objected again, arguing that the new declarations raised new issues to which they should be permitted to reply.

Just days before the matter was to be heard in the trial court, petitioners served a motion to disqualify all respondents' attorneys and to strike all respondents' submissions. Petitioners claimed that attorney Joan Gallo, who was then representing Calpine, had previously represented Great Oaks in a related matter. Since all counsel had collaborated in the defense of the lawsuit, petitioners argued that they should all be disqualified. Prior to a decision on the motion, petitioners dismissed it as to all counsel except the two attorneys representing Calpine–Gallo and Anne Mudge.

The motion was heard along with trial of the matter on June 20, 2002. Counsel argued the issues and submitted on the papers that had been filed. The trial court denied the disqualification motion without making express findings. The judgment, which states that the court reviewed "the Administrative Record in this matter, the briefs submitted by counsel, and argument of counsel" implies that the court sustained respondents' objections to petitioners' declarations. The court denied the petition for writ of mandate and entered judgment for defendants, respondents, and real parties in interest. This appeal followed.

### III. JURISDICTION

Before we proceed to a discussion of the issues, we should clarify that which we are asked to review. Petitioners' lawsuit seeks to set aside City's approval of the Silver Creek alignment. As such, the matter could be understood as an attempt to halt construction of the entire pipeline. Citing the Warren-Alquist State Energy Resources Conservation and Development Act (§ 25000 et seq.), respondents argue that this court lacks jurisdiction to halt construction of the pipeline or to pass upon City's approval of the Silver Creek alignment to the extent it involves the delivery of recycled water to MEC. According to respondents and amicus curiae only the Supreme Court of California may review an issue that was or could have been determined by the CEC.[7]

Petitioners evidently concede the point because they do not ask us to review City's decision to provide recycled water to MEC. They challenge

---

[7] With respect to power plants like MEC, the CEC has "the exclusive power to certify all sites and related facilities in the state." (§ 25500.) "[N]o court in this state [other than the Supreme Court] has jurisdiction to hear or determine any case or controversy concerning any matter which was, or could have been, determined in a proceeding before the [CEC], or to stop or delay the construction or operation of any thermal powerplant." (§ 25531, subd. (c); see *Santa Teresa Citizen Action Group v. State Energy Resources Conservation & Development Com.*, *supra*, 105 Cal.App.4th 1441.)

only City's action permitting the extension of the Project to "other potential users along the new alignment." Our review shall be limited accordingly.[8]

## IV. Issues

1. Did City violate CEQA in approving the Silver Creek alignment?

2. Is the Silver Creek alignment consistent with City's general plan?

3. Must the Silver Creek alignment be enjoined as a threatened nuisance?

4. Does the Silver Creek alignment violate the public trust doctrine?

5. Did the trial court err in denying petitioners' disqualification motion?

## V. Discussion

### A. *CEQA*

Petitioners' entire appeal focuses upon two factual allegations: (1) that the aquifer beneath North Coyote Valley lacks the protection of an aquitard and the low rates of groundwater infiltration that are present in the Golden Triangle; and (2) that City's recycled water contains concentrations of toxic substances, including NDMA and THM, in excess of drinking water standards. Petitioners' general contention is that City did not take these concerns into account when it approved the Silver Creek alignment.

### 1. *Exhaustion of Remedies*

Respondents point out that Great Oaks did not object to the Silver Creek alignment during the CEQA process and no one raised petitioners' specific concerns about groundwater contamination. According to respondents, the CEQA cause of action is barred for failure to exhaust administrative remedies.

■ In order to attack a decision that is subject to CEQA, the alleged grounds for noncompliance must have been presented to the public agency, and the person attacking the decision must have raised some objection during the administrative proceedings. (§ 21177, subds. (a), (b).) These restrictions do

---

[8] It is unclear whether this court would be acting in excess of its jurisdiction if it were to rule upon City's approval of the size or location of the pipeline. If such a ruling would stop or delay the construction of MEC, section 25531, subdivision (c) appears to prohibit it. Because we reject petitioners' challenge to City's approval of the Silver Creek alignment, we need not reach the issue.

not apply to "any alleged grounds for noncompliance with [CEQA] for which there was no public hearing or other opportunity for members of the public to raise those objections orally or in writing prior to the approval of the project, . . . ." (§ 21177, subd. (e).) This subdivision codifies the rule that unless there is a clearly defined administrative procedure for resolving complaints, the exhaustion doctrine is inapplicable. (*Rosenfield v. Malcolm* (1967) 65 Cal.2d 559, 566 [55 Cal.Rptr. 505, 421 P.2d 697].)

■ The Silver Creek alignment was not proposed until July 2001. City prepared an initial study in August 2001; adopted the initial study in September 2001 through an addendum to the FEIR; and approved the pipeline agreement with Calpine at a city council meeting on October 16, 2001. Thus, by the time the public received notice of the new alignment in connection with the October city council meeting, environmental review was effectively complete. This procedure was not inconsistent with CEQA. City was not required to give notice that an initial study was being prepared, nor was City required to circulate the addendum for public comment. (Guidelines, §§ 15063, 15164, subds. (a), (c).) Nevertheless, the result is that there was no clearly defined administrative procedure for petitioners to resolve their concerns about the project as it was finally configured, which means that the exhaustion requirement of section 21177 does not apply. (See *Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1210 [61 Cal.Rptr.2d 447] (*Azusa*).)

## 2. *The Need for an SEIR*

Petitioners claim that the 2001 initial study was inadequate because it relied upon the FEIR, which they say did not consider the geologic differences between the Golden Triangle and North Coyote Valley or the presence of certain toxic substances in the recycled water. Petitioners contend that these two considerations make the Silver Creek alignment so significantly different from the original Project that City should have prepared a subsequent or supplemental EIR (SEIR).[9]

■ We begin with the standard of review. When an agency has already prepared an EIR, its decision not to prepare an SEIR for a later project is reviewed under the deferential substantial evidence standard. (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073–1075 [230 Cal.Rptr. 413].) Petitioners argue that the stricter "fair argument" rule should apply. We disagree.

---

[9] Since it is not necessary here to distinguish between a subsequent EIR and a supplemental EIR, we shall use "SEIR" to refer to either or both types of EIR's.

In all actions challenging a public agency's decision under CEQA other than those subject to section 21168,[10] "the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) Review under this standard differs depending upon whether the agency is considering a new project or an extension or modification of an existing project. In the first instance, an agency must prepare an EIR "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66].) This test establishes a low threshold for initial preparation of an EIR, which reflects a preference for resolving doubts in favor of environmental review. (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316–1317 [8 Cal.Rptr.2d 473] (*Sierra Club*).)

■ When the public agency has already prepared an EIR, no SEIR is required unless there are substantial changes in the project or the circumstances surrounding the project, or if new information becomes available. (§ 21166.) ■ The reviewing court upholds an agency's decision not to require an SEIR if the administrative record as a whole contains substantial evidence to support the determination that the changes in the project or its circumstances were not so substantial as to require major modifications of the EIR. (*Sierra Club, supra,* 6 Cal.App.4th at p. 1318.) This deferential standard is a reflection of the fact that in-depth review has already occurred. (*Bowman v. City of Petaluma, supra,* 185 Cal.App.3d at pp. 1073–1075.)

Petitioners rely upon *Sierra Club* as support for their view that the Silver Creek alignment represents such a substantial change in the original Project that it should be treated as if it was a new project. In *Sierra Club* the county had certified a program EIR for a resource management plan that regulated mining. The plan specified lands available for future mining and provided for preservation of identified agricultural lands. (*Sierra Club, supra,* 6 Cal.App.4th at pp. 1313–1314.) Years later, a mining company proposed to amend the EIR to designate for mining a large parcel that had been identified as agricultural in the EIR. (*Id.* at p. 1314.) The appellate court held that the deferential review provided by section 21166 did not apply because the proposed project was not "either the same as or within the scope of" the program described in the EIR, which had expressly exempted the agricultural land from future mining. (*Sierra Club, supra,* 6 Cal.App.4th at p. 1321.)

---

[10] Section 21168 applies to decisions made in a case where the agency is required to hold hearings and take evidence.

In the present case, the most recent project is the same as that described in the FEIR. Petitioners' contention that it differs ignores the program portion of the FEIR and the phase 2 initial study. The Silver Creek alignment will use recycled water in the same way and in the same general location evaluated by the previous studies. Accordingly, section 21166 and the deferential substantial evidence standard govern our review. The standard applies to both the trial and appellate courts.

We independently review the administrative record. (*River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 168 [43 Cal.Rptr.2d 501].) We resolve reasonable doubts in favor of the administrative decision. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12].) "We do not judge the wisdom of the agency's action in approving the Project or pass upon the correctness of the EIR's environmental conclusions. (*Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538 at p. 1545 [252 Cal.Rptr. 79]; *City of Fremont v. San Francisco Bay Area Rapid Transit Dist.* (1995) 34 Cal.App.4th 1780 [41 Cal.Rptr.2d 157].) Our function is simply to determine whether the agency followed proper procedures and whether there is substantial evidence supporting the agency's determination that the changes in the Project (or its circumstances) were not substantial enough to require an SEIR." (*River Valley Preservation Project v. Metropolitan Transit Development Bd., supra,* 37 Cal.App.4th at p. 168.)[11]

We cannot discern any significant change in the Project or its circumstances arising from the Silver Creek alignment. The location of the Silver Creek alignment is not significantly different from the Via del Oro alignment that was fully evaluated and subject to public review and comment in connection with the phase 2 initial study and negative declaration. Both routes extend into North Coyote Valley, and both routes terminate at or near the MEC site. Petitioners do not explain, nor does the record shed any light upon how, if at all, the Silver Creek route poses a different or greater threat to the aquifer than that posed by the Via del Oro route.

Both the FEIR and the phase 2 initial study determined that degradation of the groundwater was a potentially significant impact of a recycled water project but that the impact was reduced to insignificant by the implementation of various mitigation measures. The program portion of the FEIR recognized

---

[11] ▮ Petitioners analyze the adequacy of the initial study separately from the question of whether City should have prepared an SEIR. The analyses are interrelated. When a project falls within the scope of a previous EIR, the initial study is used to decide whether there are *new* impacts that were not discussed in the prior EIR and to focus upon whether those new impacts warrant further environmental review. (§ 21094, subd. (c); Guidelines, § 15063, subd. (b)(1)(C).) Since the question of whether the agency should have prepared an SEIR is really the ultimate issue, we shall focus our discussion upon it.

the greater risk to the groundwater in areas where the aquifer was unconfined. The phase 2 study evaluated the issue in North Coyote Valley specifically, and acknowledged that the aquifer in this area was unconfined and that the ground was more permeable there.

■ To the extent any previously unidentified toxic substances may occur in the recycled water, their presence does not give rise to a different or substantially more severe impact than that already considered by the FEIR and the phase 2 initial study. The recycled water produced by the Project is nonpotable—it is not intended to be drunk. The concern about contaminating the groundwater implicitly acknowledges that nonpotable water contains substances that are not safe for drinking. All of the environmental documents pertaining to the Project recognize that fact.

In sum, the record contains substantial evidence supporting the conclusion that the environmental impact of the Silver Creek alignment upon the groundwater in North Coyote Valley was not substantially different from or greater than the impacts considered in the previous studies.

■ Petitioners go on to contend that the initial study failed to consider that approval of the Silver Creek alignment would conflict with the ground-water policies in City's general plan. The argument again ignores the record. The FEIR and the phase 2 initial study both determined that the Project was consistent with City's general plan policies. Since the Silver Creek alignment does not pose a new or substantially greater threat to the groundwater than that previously considered, the initial study was not required to reevaluate its consistency with the general plan.

Petitioners also argue that City should not have relied upon the FEIR's "vague and unspecified" mitigation measures in determining that the Silver Creek alignment posed no significant environmental impact. Petitioners' reliance upon *Azusa, supra,* 52 Cal.App.4th at page 1210 as support for this argument is misplaced. In *Azusa* the Court of Appeal held that the public agency erred in declaring a project exempt from CEQA without having evaluated the proposed mitigation under standards for a mitigated negative declaration. The agency's own evaluation of the project determined that even with the proposed mitigation measures the potential impact of the project could be significant, but it nevertheless decided that the project was exempt from CEQA. (*Id.* at p. 1188.) The appellate court set aside the agency's decision because, among other things, there had been no full evaluation of the environment effects of the project. (*Id.* at p. 1201.) That is, an EIR had *never* been prepared.

■ In the present case, the environmental effects of the Project and the efficacy of the mitigation measures were evaluated in detail in the FEIR and

the phase 2 initial study. Unlike the situation in *Azusa*, there has been a full environmental evaluation of the existing Project. City's conclusion that the Silver Creek alignment does not amount to a significant departure from the Project as previously evaluated means that City was not required to revisit the mitigation measures prescribed. Indeed, absent a significant change in the Project, the certified FEIR is conclusively presumed to be valid. (§ 21167.2.)[12]

### 3. *Extra-record Evidence*

Petitioners argue that an SEIR was necessitated by new information. But the new information upon which petitioners rest their argument is the alleged presence of NDMA and THM in the recycled water—information that petitioners collected privately after City approved the Silver Creek alignment.

■ The question of whether there is substantial evidence to support the agency's decision concerns the evidence *in the record*. This is a question of law. The existence of evidence outside the record, such a petitioners' extra-record evidence here, is irrelevant to that question and is inadmissible for that reason. (*Western States, supra*, 9 Cal.4th at pp. 572–573.) ■ In some cases the extra-record evidence might be admissible to prove that the agency did not proceed as required by law, as when petitioners raise issues such as "standing . . . , the accuracy of the administrative record, . . . procedural unfairness, and . . . agency misconduct." (*Id.* at pp. 575–576, fn. 5.)

Petitioners do not address the admissibility of the evidence in their opening brief. Petitioners' reply suggests that the extra-record evidence concerning the presence of NDMA and THM shows that City ignored important public health issues or, in effect, that City failed to proceed in the manner required by law. The evidence they have submitted, however, does not support this contention.

The substance of petitioners' concern is contained in the Curry declaration. Curry opined: "The question is whether use of these recycled waters for irrigation and landscaping may significantly degrade the quality of Great Oaks' drinking water supply through contamination by NDMA and other toxic chemical [*sic*]: The answer is clearly yes: it may do so, . . ." That the Project *may* pose a threat to the groundwater is a possibility that is acknowledged throughout the administrative record. Petitioners are simply incorrect when they state that City failed to address this concern.

---

[12] Some of the mitigation measures are necessarily nonspecific. The requirement that the quality and use of recycled water conform to all public health and safety regulations is an example. This requirement means that the Project must address water quality issues as they arise and adjust specific mitigation measures as harmful substances are identified and as reliable techniques are developed to test for them.

As our Supreme Court has stated: "Were we to hold that courts could freely consider extra-record evidence in these circumstances, we would in effect transform the highly deferential substantial evidence standard of review in Public Resources Code section 21168.5 into a de novo standard, and under that standard the issue would be not whether the administrative decision was rational in light of the evidence before the agency but whether it was the wisest decision given all the available scientific data. The propriety or impropriety of a particular legislative decision is a matter for the Legislature and the administrative agencies to which it has lawfully delegated quasi-legislative authority; such matters are not appropriate for the judiciary." (*Western States, supra,* 9 Cal.4th at p. 572.) Petitioners' extra-record evidence is inadmissible to support the writ petition.

### B. *Consistency with the General Plan*

Petitioners also sought a writ of mandate outside the CEQA context. (Code Civ. Proc., § 1085.) The gist of petitioners argument is that City's approval of the Silver Creek alignment is inconsistent with its general plan policies relating to protection of the groundwater supply.

On appeal from the denial of a writ of mandate we must determine whether City's decision was arbitrary, capricious, entirely lacking in evidentiary support, or procedurally unfair. (*Associated Builders & Contractors, Inc. v. San Francisco Airports Com.* (1999) 21 Cal.4th 352, 361 [87 Cal.Rptr.2d 654, 981 P.2d 499].) Consistency with the general plan can be a measure of whether City abused its discretion in approving the challenged project. (See *Mira Development Corp. v. City of San Diego* (1988) 205 Cal.App.3d 1201, 1214–1215 [252 Cal.Rptr. 825].) Here, it is the only factor that petitioners assert to challenge City's action as an abuse of discretion.

■■■ In light of our conclusion that the Silver Creek alignment poses no threat to the groundwater that was not addressed in the prior documents, and given that the prior environmental reviews determined that the Project was consistent with City's general plan policies, City's approval of the new alignment cannot be deemed arbitrary, capricious, unsupported or unfair. The trial court did not err in denying the writ.

### C. *Nuisance*

Petitioners next argue that City's approval of the Silver Creek alignment threatens to create a nuisance pursuant to Civil Code sections 3479 and 3493, Water Code section 13350, and Fish and Game Code section 5650. Petitioners presume as they have all along that expanding the use of recycled water

to new users in North Coyote Valley will inevitably contaminate the aquifer. Respondents argue the issue is not ripe for review. We agree with respondents.

 "[A] basic prerequisite to judicial review of administrative acts is the existence of a ripe controversy." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 169 [188 Cal.Rptr. 104, 655 P.2d 306].) The ripeness doctrine is based upon the recognition that judicial decisions are best made in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy. (*Id.* at p. 170.) " 'The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. [Citation.] It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.' " (*Id.* at pp. 170–171.) " 'A controversy is "ripe" when it has reached, but has not passed, the point that the facts have sufficiently congealed to permit an intelligent and useful decision to be made.' " (*Id.* at p. 171, quoting *California Water & Telephone Co. v. County of Los Angeles* (1967) 253 Cal.App.2d 16, 22 [61 Cal.Rptr. 618].) Courts will not be drawn into disputes that depend for their immediacy on speculative future events. (*Id.* at p. 173.)

The instant case is similar to a case seeking review of administrative regulations prior to their application. In those cases, it has been stated: "[The] basic rationale [of the ripeness doctrine] is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. The problem is best seen in a twofold aspect, requiring us to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." (*Abbott Laboratories v. Gardner* (1967) 387 U.S. 136, 148–149 [18 L.Ed.2d 681, 87 S.Ct. 1507].)

 Applying these principles to the case at hand, we conclude that petitioners' nuisance claim lacks the urgency and definiteness necessary to make it ripe for adjudication. It is true that petitioners seek to entirely prevent the use of recycled water in North Coyote Valley and that respondents have an interest in finding new recycled water users in that location. To that extent, the parties' interests are adverse. However, the real issue is whether the use of the water would threaten the groundwater supply. The record does not support petitioners' suggestion that *any* use of the water will inevitably contaminate the aquifer. And no use other than MEC's has yet been approved.

Absent approval of some specific use, we have no facts upon which to evaluate whether a particular use might constitute a nuisance.

The hardship to the parties of withholding court consideration does not demand the matter be resolved now. Any hardship inherent in delaying adjudication may never arise. Petitioners' alleged injury depends upon the assumption that City will approve uses for recycled water that pose a significant risk to the aquifer from which petitioners obtain their drinking water. Although it is fairly certain that new recycled water users will eventually be brought on line, the likelihood that City will permit new uses without regard to the risks is speculative at best.

This is not to say that petitioners must permit the groundwater to become contaminated before the issue will be justiciable. We merely hold that in order to rule upon the issue, the threatened nuisance must be more definite than it is here.

### D. *Public Trust*

Petitioners contend that the Silver Creek alignment will violate the public trust doctrine. Under the public trust doctrine, the state has title as trustee to all tidelands and navigable lakes and streams and is charged with preserving these waterways for navigation, commerce, and fishing, as well as for scientific study, recreation, and as open space and habitat for birds and marine life. (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 434–435 [189 Cal.Rptr. 346, 658 P.2d 709].) As respondents point out, the doctrine has no direct application to groundwater sources. To the extent it applies to Coyote Creek itself, there is no evidence in the record from which we may conclude that the potential irrigation of the surrounding area threatens the public's interest in this waterway. Furthermore, as is the case with the nuisance cause of action, the issue is not ripe for decision.

### E. *Disqualification of Counsel*

Petitioners finally argue that the trial court erred in denying their motion to disqualify Calpine's attorneys Gallo and Mudge. They claim that disqualification was required because Gallo had formerly represented Great Oaks in a related matter and that Mudge should also be disqualified because, even though the two attorneys belonged to different law firms, they worked closely together on this case.

Gallo's former representation of Great Oaks was short-lived. Great Oaks had sought Gallo's assistance in a dispute with City over who would be permitted to expand water services into currently unserved areas in the

Coyote Valley. Gallo met with Roeder and other Great Oaks employees on March 20, 2001. Gallo recalls that they discussed "how we would explain to [City] the nature of Great Oaks investment in potable water infrastructure in the unserved territory." Since Gallo was also representing City at the time, she informed Roeder that she would not take any position adverse to City and she sought Roeder's written consent to waive the potential conflict. Gallo intended to limit her representation of Great Oaks to advocating Great Oaks' position on the service area issue. She went so far as to register with City as a lobbyist for that purpose. She soon decided that it would not be possible to work around the potential conflict and withdrew from the Great Oaks representation in a letter dated April 26, 2001. Although her firm billed Great Oaks for three hours (two hours for the March 20 meeting and one hour for reading documents), Gallo forgave the bill. Gallo began advising Calpine in or around May 2001. She has been identified as representing Calpine in this litigation since at least January 2002.

Roeder states that he retained Gallo "in connection with [Great Oaks'] objection to the potential extension of potable and non-potable water services by [City] into areas adjacent to or within the service area of [Great Oaks]." Roeder describes the March 20, 2001 meeting as one in which he educated Gallo about Great Oaks' "efforts to provide high quality drinking water . . . and [Great Oaks'] current and future interest in maintaining and expanding its delivery of high quality drinking water to this area." Roeder goes on to say that Great Oaks "divulged highly confidential and sensitive information with regard to [Great Oaks'] operations, financial condition, future service plans, and concerns about threats to [Great Oaks'] water supply and delivery capacity. In particular, we discussed at length [Great Oaks'] concerns with regard to the threatened extension of potable and non-potable water services from [City] into [Great Oaks'] current and planned future service areas." Roeder claimed he did not learn of Gallo's representation of Calpine in this case until June 10, 2002, 10 days before the trial.

We review the trial court's decision under the familiar abuse of discretion standard. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143–1144 [86 Cal.Rptr.2d 816, 980 P.2d 371].) "If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.]" (*Id.* at p. 1143) Where there are no material disputed factual issues, we review the trial court's determination as a question of law. (*Id.* at p. 1144.)

An attorney is required to avoid the representation of adverse interests. The attorney cannot, "without the informed written consent of the client or former client, accept employment adverse to the client or former

client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." (Rules Prof. Conduct, rule 3-310(E).) Whether or not disqualification is required in successive representation cases depends upon two variables: "(1) the relationship between the legal problem involved in the former representation and the legal problem involved in the current representation, and (2) the relationship between the attorney and the former client with respect to the legal problem involved in the former representation." (*Jessen v. Hartford Casualty Ins. Co.*, (2003) 111 Cal.App.4th 698, 709 [3 Cal.Rptr.3d 877].) Where, as here, the attorney had direct contact with the former client, disqualification will usually be determined by the first variable. (See *Ibid.*)

■ The fact of a prior representation itself does not preclude an attorney from accepting a subsequent representation adverse to the former client if the matter is not substantially related to the previous employment. Nor is the attorney precluded from accepting a representation in the same general matter where his employment is not adverse to his former client. The attorney is only precluded from a subsequent representation that is adverse to the former client and that involves a matter that is substantially related to the previous employment. (*Grove v. Grove Valve & Regulator Co.* (1963) 213 Cal.App.2d 646, 651–652 [29 Cal.Rptr. 150].) Therefore, even where the two representations involve the same general subject, disqualification is not required if the nature of the factual and legal questions posed are not similar. (*H. F. Ahmanson & Co. v. Salomon Brothers, Inc.* (1991) 229 Cal.App.3d 1445, 1456–1457 [280 Cal.Rptr. 614].)

We must also recognize that disqualification motions are commonly used for purely strategic purposes to delay the litigation, harass the opposing party or pressure for a more favorable settlement. (*H.F. Ahmanson & Co. v. Salomon Brothers, Inc., supra*, 229 Cal.App.3d at p. 1454.) As our Supreme Court has noted: "A motion to disqualify a party's counsel may implicate several important interests. Consequently, judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice. [Citation.] Depending on the circumstances, a disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra*, 20 Cal.4th at pp. 1144–1145.)

In this case the declarations are materially undisputed. Great Oaks hired Gallo to help protect its plans to expand its water services. Arguably, Gallo's representation of Calpine is not adverse to Great Oaks in that Calpine's interest is in the construction of its power plant. To the extent that Calpine's

position in support of City's action is adverse to Great Oaks, the factual and legal issues involved are not substantially similar to those involved in the prior representation. The sole basis for this lawsuit is petitioners' concern about the safety of using recycled water for irrigation in North Coyote Valley. Petitioners cite four theoretical legal impediments to that use, lack of compliance with CEQA, inconsistency with City's general plan, threat of nuisance, and violation of the public trust. Assuming that Roeder shared with Gallo confidential business plans and strategies, we cannot see how that information is material the issues raised in this case. Resolution of the instant dispute requires resort to the facts set forth in the administrative record. These are undisputed facts to which we apply settled rules of law. Great Oaks' business plans have no bearing upon those issues.

Although Great Oaks contends that it hired Gallo at "the initial stages of the present action" that cannot be so. In March 2001, when Great Oaks first retained Gallo, the Silver Creek alignment had not yet been proposed. City did not begin studying the Silver Creek alignment until August 2001, four months after Gallo withdrew from her representation of Great Oaks. Since this lawsuit challenges only the environmental effects of the Silver Creek alignment, Great Oaks could not have hired Gallo at the initial stages of *this* action.

It is also evident that granting the disqualification motion on the eve of trial would have resulted in substantial prejudice to the defense. Calpine would have been deprived of its choice of counsel and a substantial continuance would have been required in order to allow it to find new counsel and prepare for trial a second time.

We conclude that since the legal issues involved in the successive representations were entirely separate and considering that petitioners waited until the eleventh hour to file their disqualification motion, the trial court did not abuse its discretion in denying the motion.

## VI. DISPOSITION

The judgment is affirmed.

Rushing, P. J., and Mihara, J., concurred.

A petition for a rehearing was denied January 13, 2004.