Filed 6/8/23 Certified for Publication 7/7/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| OLEN PROPERTIES CORP., | |
| Plaintiff and Appellant, | G061427 |
| v. | (Super. Ct. No. 30-2021-01185991) |
| CITY OF NEWPORT BEACH, | O P I N I O N |
| Defendant and Respondent; | |
| TPG (KCN) ACQUISITION, LLC, | |
| Real Party in Interest and Respondent; | |
| YIMBY LAW et al., | |
| Interveners and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, William D. Claster, Judge.  Affirmed.

Law Offices of Geoffrey Willis and Geoffrey Willis for Plaintiff and Appellant.

Richards, Watson & Gershon and Ginetta L. Giovinco for Defendant and Respondent.

Holland & Knight, Jennifer L. Hernandez, and Jessica Laughlin for Real Party in Interest and Respondent.

Miller Starr Regalia, Matthew C. Henderson, and Kenneth A. Stahl for Intervener and Respondent YIMBY Law.

Californians for Homeownership, Matthew P. Gelfand, and Allyson H. Richman for Intervener and Respondent Californians for Homeownership.

*     *     *

FACTS AND PROCEDURAL HISTORY

Plaintiff Olen Properties Corp. owns commercial property in the City of Newport Beach (the City) at 4910 Birch Street, within an area known as the Koll Center. The Koll Center is a mixed-use development area, bounded by Campus Drive, Jamboree Road, and MacArthur Boulevard, and is near the John Wayne Airport, San Joaquin Freshwater Marsh Reserve, and the University of California, Irvine.  It is located within the "Airport Area," a portion of the City adjacent to John Wayne Airport, governed by the City's Airport Business Area Integrated Conceptual Development Plan.  In 2020 and 2021, the City considered and approved the request of Real Party in Interest TPG (KCN) Acquisition, LLC (TPG) to develop a five-story, 312-unit residential housing project (the Project) on an existing surface parking lot serving the Koll Center's existing commercial tenants. (See appendix A.)

2

In an effort to comply with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; CEQA),[1] the City obtained an addendum (the Addendum) to an existing environmental impact report prepared in 2006 (the 2006 EIR) as part of its general plan update. The Addendum considered a wide range of possible environmental impacts but concluded the Project's impacts "would either be the same or not substantially greater than those described by the [2006 EIR]." This finding enabled the City to approve the Project without preparing a new environmental impact report (EIR).

*Plaintiff Opposes the Project*

Plaintiff opposed approval of the Project before the City. Among other things, plaintiff argued the City could not rely upon an addendum to the 2006 EIR and was legally required to obtain a subsequent EIR. In support of this argument, plaintiff cited (again, among other things) traffic issues, hazardous materials, the Koll Center's covenants, conditions and restrictions (CC&Rs) of the existing development, geology and soil issues, and various land use policies of the City.

*The City's Land Use Policies*

Two of the land use policies cited by plaintiff relate to this appeal: land use policies 6.15.6 and 6.15.13, each of which applies to the mixed use horizontal 2 (MU-H2) land use category, which encompasses the Project. Policy 6.15.6 allows "development of mixed-use residential villages, each containing a minimum of 10 acres and centered on a neighborhood park and other amenities . . . . The first phase of residential development in each village shall encompass at least 5 gross acres of land, exclusive of existing rights-of-way. This acreage may include multiple parcels provided that they are contiguous or

_____

[1] All statutory references are to the Public Resources Code unless otherwise stated.

3

face one another across an existing street. At the discretion of the City, this acreage may also include part of a contiguous property in a different land use category, if the City finds that a sufficient portion of the contiguous property is used to provide functionally proximate parking, open space, or other amenity. The 'Conceptual Development Plan' area . . . shall be exempt from the 5-acre minimum, but a conceptual development plan described in Policy LU 6.15.11 shall be required."

Policy 6.15.13 states, "To provide a focus and identity for the entire neighborhood and to serve the daily recreational and commercial needs of the community within easy walking distance of homes, require dedication and improvement of at least 8 percent of the gross land area (exclusive of existing rights-of-way) of the first phase development in each neighborhood, or [one-half] acre, whichever is greater, as a neighborhood park. This requirement may be waived by the City where it can be demonstrated that the development parcels are too small to feasibly accommodate the park or inappropriately located to serve the needs of local residents, and when an in-lieu fee is paid to the City for the acquisition and improvement of other properties as parklands to serve the Airport Area. [¶] In every case, the neighborhood park shall be at least 8 percent of the total Residential Village Area or one acre in area, whichever is greater, and shall have a minimum dimension of 150 feet. Park acreage shall be exclusive of existing or new rights-of-way, development sites, or setback areas. A neighborhood park shall satisfy some or all of the requirements of the Park Dedication Ordinance, as prescribed by the Recreation Element of the General Plan."

Plaintiff contends the Project's residential village was comprised of only 3.41 acres, rather than the 10 acres required by policy 6.15.6, and the park was an irregular shape, with some dimensions of 20 feet or less, rather than the minimum 150 feet required by policy 6.15.13. An illustrative diagram of the park is reproduced and attached as appendix B.

4

*Traffic Issues*

Plaintiff raised two issues relating to traffic before the City, only one of which relates to this appeal. That issue involves a change in the appropriate method for determining traffic impact. In 2018, California adopted CEQA Guidelines section 15064.3,[2] which changed the measure of traffic impact from level of service (LOS) to vehicle miles traveled (VMT). The 2006 EIR used the LOS measure, as it predated the change to VMT by more than a decade. The traffic study for the Project was conducted in 2020, but also used the LOS measure because the purpose of the study was to compare the effects of the Project to the 2006 EIR.

*Hazardous Materials*

Plaintiff's arguments about hazardous materials arose from the Project's proximity to the site of a preexisting semiconductor plant. Plaintiff provided the City with a letter from an environmental consulting firm describing potential problems for the Project, both in construction and after completion, arising from the presence of various chemicals released from the semiconductor plant. The City countered this letter with an expert report of its own, which indicated that plaintiff's expert was working from outdated information, and more recent testing of the groundwater demonstrated that there was no environmental issue.

*The CC&Rs*

Plaintiff argued to the City that the Addendum was inadequate because it failed to consider the CC&Rs, which plaintiff contends barred this construction. The

---

[2] The term "CEQA Guidelines" refers to the regulations for the implementation of CEQA authorized by the Legislature (§ 21083), codified in title 14, section 15000 et seq., of the California Code of Regulations, and will be referred to as the "CEQA Guidelines."

City concluded the CC&Rs were covenants between private parties, not the City, and were not environmental issues under CEQA.

*Geology and Soil Issues*

Plaintiff argued to the City that the Addendum was internally inconsistent on the geological mitigation conditions. Specifically, plaintiff argued the Addendum itself called for only "Standard Conditions" for handling soils on the Project, while appendix B to the Addendum, an analysis by a geotechnical engineer, described certain mitigation measures necessitated by the conditions of the Project site. Plaintiff also argued the Project violated the general plan by digging into previously undisturbed soil without an onsite paleontologist. The City rejected this contention.

*Litigation*

After the City's approval of the Project, plaintiff filed suit, seeking a writ of mandate compelling the City to void its approval for violation of CEQA, and for injunctive relief, barring construction at the site. Plaintiff alleged various violations of CEQA, including the arguments described above.[3] The trial court denied plaintiff's petition, and entered judgment for the City. The trial court explained its denial in an extensive written ruling, addressing and rejecting each of the arguments set forth above. Plaintiff timely appealed.

DISCUSSION

Plaintiff contends the trial court erred in denying its petition. Plaintiff raises two related but distinct arguments: first, that the Project's approval is inconsistent with the City's land use policies, and second, that new conditions, not addressed by the

[3] Interveners YIMBY Law and Californians for Homeownership intervened in the litigation at the trial court level and have also appeared in this proceeding.

6

2006 EIR, required the City to prepare a subsequent EIR, rather than relying on the Addendum. We begin with the land use policies.

*Consistency with Land Use Policies*

Cities in California must adopt general plans for development. (Gov. Code, § 65300.) These plans become the ""constitution for all future developments" within the city.'" (*Orange Citizens for Parks & Recreation v. Superior Court.* (2016) 2 Cal.5th 141, 152.) The formation and amendment of these plans must follow a process prescribed by statute, including submission to other public entities and holding public hearings. (*Id.* at p. 153.) Upon its adoption and unless amended, the plan binds the city in its consideration of subsequent proposals for land use and development. (*Ibid.*) In other words, a city's approval of a project for development is invalid if it is inconsistent with the general plan.

As part of its general plan, the City adopted certain land use categories, with different land use policies applicable to each category. Thus, these land use policies are part of the general plan, and the City's approval of the Project is valid only if the Project is consistent with the land use policies. We review a city's determination whether a project is consistent with its general plan for abuse of discretion. (*Orange Citizens for Parks & Recreation v. Superior Court*, *supra*, 2 Cal.5th at pp. 154-155.) As plaintiff acknowledges, a city's determination of general plan consistency can only be reversed if, on the evidence before the city at the time of the determination, "no reasonable person could have reached the same conclusion." (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 782.)

The two land use policies at issue here are policies 6.15.6 and 6.15.13, each of which applies to the MU-H2 land use category, which encompasses the Project. The text of each is reproduced above.

7

Plaintiff argues the Project is inconsistent with policy 6.15.6 (which requires a "residential village" to contain a minimum of 10 acres) because the City failed to make certain necessary findings to include adjacent and nearby land governed by a different land use category into the residential village. The Project itself spans only 3.41 acres. However, the term "residential village" is not defined by the City's policies, and the 10-acre minimum plainly may include land not actively being developed for housing, including the required neighborhood park, "functionally proximate parking, open space, or other amenity." The City's planning commission defined the "residential village" in question as encompassing the entirety of the Koll Center, including the office buildings and parking. The planning commission conceptualized the residential village as a "mixed-use environment where future residents could walk or bike to work, retail locations, and the transit." Because of the absence of a more specific limitation on the types of adjacent land to be included in a residential village to meet the 10-acre minimum, the City's interpretation of the policy was within its discretion.

Plaintiff also contends the City cannot now rely on the planning commission's reasoning, arguing that the City council itself must make the necessary findings. However, the City adopted the planning commission's resolution, which included this reasoning, as part of its own resolution approving the Project.

Plaintiff also argues the Project is inconsistent with policies 6.15.6 and 6.15.13 with respect to the Project's park. Plaintiff argues first that the park is a "public park," not a "neighborhood park," as required by policy 6.15.6. For this proposition, plaintiff relies on the language of the Addendum, which states, "The Project does not include a neighborhood park; it does include a 1.1-acre public park that would be accessible during daytime hours."

8

Just as the trial court was, we are puzzled by this statement. The only distinction between a public park and a "neighborhood park" within the meaning of the land use policy is the size and dimension requirements imposed by policy 6.15.13; a public park that complies with those requirements *is* a "neighborhood park." And the Addendum states, just two pages later, that the park complies with those requirements. Thus, we conclude this statement in the Addendum, standing alone, does not constitute some sort of irrevocable admission by the City that the Project is inconsistent with policy 6.15.6. Instead, we evaluate whether the park complies with the substantive requirements of policy 6.15.13.

Plaintiff does not appear to dispute that the park is sufficiently large in terms of area. Instead, plaintiff argues the park does not have a "minimum dimension" of 150 feet or greater. The term "minimum dimension" is not defined in the City's land use policies. A "dimension" is a "measure in one direction." (Webster's Collegiate Dict. (10th ed. 1996) p. 325.) The City is describing a park on a map, which is a two-dimensional space, having a length and a width. Thus, we conclude the "minimum dimension" is the lesser of the length or width of the park.

However, the policy is ambiguous as applied to parks having irregular (i.e., nonrectangular) shapes. As the trial court noted, even a simple triangular park poses problems for the City in determining compliance; is the width to be measured at the base of the triangle or at some other point? Plaintiff argues the minimum dimension must be "an outside perimeter dimension."[4] We reject that conclusion, as it creates absurd results.

---

[4] Plaintiff argues the trial court also adopted this view, but the trial court's written ruling suggests otherwise, as it discusses the possibility of a "dimension" measured through the interior of an equilateral triangle, which is not part of the "outside perimeter."

9

Consider, for example, a park composed of two adjoining squares. The larger square is a mile long on each side, exceeding by many times the 150-foot requirement. The smaller square, however, is only 100 feet long on each side. Because this arrangement creates a portion of the perimeter spanning only 100 feet in length, under plaintiff's reading of the policy, this short span becomes the "minimum dimension," which disqualifies the park from being considered a "neighborhood park." Perversely, removing the smaller square, and therefore reducing the amount of park available for residents, would restore the park's status as a neighborhood park.

The purpose of policy 6.15.13 is "[t]o provide a focus and identity for the entire neighborhood and to serve the daily recreational and commercial needs of the community within easy walking distance of homes," not to create a specific geometric shape. We therefore conclude the "minimum dimension" requirement simply requires the park to contain a space that exceeds 150 feet in two dimensions, measured from any point within the park's space. The Project's park qualifies: it exceeds 150 feet in length along Von Karman and is more than 150 feet deep through the linear portion of the park. Accordingly, the City acted within its discretion in deeming the park a "neighborhood park" and concluding it was consistent with land use policies 6.15.6 and 6.15.13.

*CEQA Compliance*

Plaintiff argues new conditions required preparation of a subsequent EIR. Plaintiff argues we should, in making this determination, apply the reverse substantial evidence test described in *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1319 (*Sierra Club*). That test applies in limited circumstances—only where the initial EIR is a "program EIR" (as opposed to a more typical "project EIR")[5] and a subsequent

---

[5] A program EIR is "an EIR which may be prepared on a series of actions that can be characterized as one large project and are related either: [¶] (1) Geographically, [¶] (2) [a]s logical parts in the chain of contemplated actions, [¶] (3) [i]n

10

project is proposed which is not "the same as or within the scope of the Project, program, or plan described in the program EIR." (*Sierra Club*, at p. 1321.) The first of these circumstances is present here; the 2006 EIR is indeed a "program EIR." The latter circumstance is not. The 2006 EIR expressly contemplated the construction of higher density housing within the Airport Area. Accordingly, the *Sierra Club* standard does not apply here.

Instead, the appropriate standard is the deferential substantial evidence standard, applied to section 21166. (*Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 703-704.) Under that standard, we consider whether substantial evidence supports the City's determination that none of the three conditions for requiring a subsequent or supplemental EIR under section 21166 exist. (*Santa Teresa Citizen Action Group*, at p. 704.) Those conditions are: "Substantial changes are proposed in the Project which will require major revisions of the [EIR]," "[s]ubstantial changes occur with respect to the circumstances under which the Project is being undertaken which will require major revisions in the [EIR]," or "[n]ew information, which was not known and could not have been known at the time the [EIR] was certified as complete, becomes available." (§ 21166.)

"We independently review the administrative record. [Citation.] We resolve reasonable doubts in favor of the administrative decision. [Citation.] 'We do not judge the wisdom of the agency's action in approving the Project or pass upon the correctness of the EIR's environmental conclusions. [Citation.] Our function is simply to determine whether the agency followed proper procedures and whether there is

---

connection with issuance of rules, regulations, plans, or other general criteria to govern the conduct of a continuing program, or [¶] (4) [a]s individual activities carried out under the same authorizing statutory or regulatory authority and having generally similar environmental effects which can be mitigated in similar ways." (Cal. Code Regs., tit. 14, § 15168.) In plain English, a program EIR is an EIR about a broad program or plan, as opposed to a specific project.

11

substantial evidence supporting the agency's determination that the changes in the Project (or its circumstances) were not substantial enough to require [a subsequent EIR].'" (*Santa Teresa Citizen Action Group v. City of San Jose*, *supra*, 114 Cal.App.4th at p. 704.)

Plaintiff identifies five changes or items of new information that it contends require preparation of a subsequent EIR. The first of these, inconsistency with the City's land use policies, we addressed and rejected above. The remaining four are traffic issues, hazardous materials, the CC&Rs, and geology/soil issues. We address each in turn.

*Traffic Issues*

As described above, plaintiff argues the City erred by using the LOS measure of traffic impact, despite California's adoption of CEQA Guidelines section 15064.3, which requires use of the VMT method. The City used the LOS measure because that was the measure used in the 2006 EIR. Plaintiff admits the VMT measure is "completely incompatible with LOS." Nevertheless, plaintiff argues the City should have used the VMT method to measure traffic impacts in its Addendum. Plaintiff makes no attempt to explain how the City could compare LOS apples with VMT oranges to determine whether there have been substantial changes in the Project or the circumstances under which the Project was undertaken.

Moreover, CEQA Guidelines section 15064.3 operates only "prospectively." (Cal. Code Regs., tit. 14, § 15064.3, subd. (c).) And it is settled law in California that subsequent changes to the guidelines are not "new information" triggering section 21166, subdivision (c), so long as the underlying environmental issue was understood at the time of the initial EIR. (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1318-1320.) Indeed, the rule could hardly be any different—if each change to guidelines constituted "new information," section 21166

12

would require a new EIR nearly every time any change is made to a project, no matter how inconsequential.

Accordingly, we conclude the City was not required to undertake a VMT study of the traffic impact of the Project.

*Hazardous Materials*

Plaintiff contends the hazardous waste associated with the Project's proximity to a preexisting semiconductor plant requires preparation of a subsequent EIR. As discussed above, the record contains two competing expert opinions, one from plaintiff's expert, and one from an expert retained by the City in response. Plaintiff's expert contends the Project will disturb hazardous waste and create environmental problems; the City's expert opines there is no environmental issue.

The standard of review determines the outcome here. If, as plaintiff contends, the *Sierra Club* standard applied, plaintiff's expert's opinion might constitute substantial evidence requiring preparation of a subsequent or supplemental EIR. But, as we explain above, that standard does not apply. The City's expert's opinion is substantial evidence in support of the City's position that the hazardous waste will not create environmental problems for the Project.

*The CC&Rs*

Plaintiff argues the Project will violate the existing CC&Rs. Plaintiff contends this is more than "a private matter," because it involves "known use restrictions that are being ignored or improperly overridden by the City." Plaintiff argues the CC&Rs would protect the existing building owners from "disharmony through tiny setbacks, conflicting internal circulation, parking shortages, noise and concerns about quiet enjoyment, safety of children thrown into the middle of a commercial development, and many others."

13

These underlying concerns and policy goals may be environmental issues, but to the extent they are, they were discussed in the 2006 EIR and Addendum. The CC&Rs themselves, by contrast, are covenants between private parties conveying certain private property rights. Plaintiff identifies no authority, whether in the form of a statute, regulation, or published case, that requires consideration of CC&Rs in an EIR. Moreover, as TPG points out, the CC&Rs predate the 2006 EIR by several decades, meaning they cannot constitute changes in the Project or its circumstances since the 2006 EIR, or "new information" developed thereafter.[6]

*Geology and Soil Issues*

Lastly, plaintiff argues a subsequent EIR is required because of two geological or soil-related issues. The first issue involves a geotechnical report prepared as part of the Appendix. The geotechnical report identifies certain technical recommendations for the construction of the Project. These recommendations are based upon the soil conditions at the Project site and are designed to ensure that the Project's construction is successfully completed without issues arising from soil composition (e.g., structural issues caused by soil settlement, moisture, temperature, etc.).

Plaintiff contends these recommendations demonstrate that "impacts associated with geology and soils could be significant, and that Project-specific mitigation measures are required to reduce impacts to less than significant levels." However, other than certain shoring recommendations, which could potentially affect adjacent properties, the geotechnical recommendations are not aimed at mitigating environmental or soil issues, but rather at ensuring that the Project can be successfully built and remain intact. For example, the recommendation to encase buried metal

_____

[6] Our opinion on this point has no bearing on whether plaintiff or other property owners in the Koll Center may have claims against other private parties arising from the Project based on the CC&Rs. Those questions are not before us.

14

materials with plastic or other corrosion-resistant material has nothing to do with protecting the environment from the Project; rather, it aims to protect the Project from the environment.

As to the shoring recommendations, as the trial court observed, shoring is a standard construction practice primarily designed to maintain a safe workplace and a functional construction site and is regulated principally by the California Division of Occupational Safety and Health, not through the CEQA process. The effects of shoring on adjacent properties (perhaps more accurately described as the protection to adjacent properties provided by shoring) are ancillary to the primary purpose of the shoring, and in any event, are minimal. Substantial evidence supported the City's determination that the shoring recommendations by the geotechnical engineer did not constitute a substantial change to the Project or its circumstances or new information requiring preparation of a subsequent or supplemental EIR.

The second (and final) issue relates to paleontological monitoring of the Project site. The City's general plan policy HR 2.2 requires "a qualified paleontologist/archeologist to monitor all grading and/or excavation where there is a potential to affect cultural, archeological or paleontological resources." The City's standard conditions and requirements, meanwhile, require anyone excavating previously undisturbed soil to "retain a qualified paleontologist to be available on-call during ground-disturbing activities onsite."

Plaintiff argues that these policies conflict, and that the City allowed TPG to adopt the standard conditions and requirements (with an on-call paleontologist) instead of requiring permanent on-site monitoring. However, the policies do not conflict. HR 2.2.'s requirement that a paleontologist "monitor" the site does not include a requirement for constant physical presence.

15

## DISPOSITION

The judgment is affirmed.   Respondents shall recover their costs on appeal.


SANCHEZ, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


DELANEY, J.

APPENDIX A



APPENDIX B



| PUBLIC OPEN SPACE | |
| --- | --- |
| Public Park | 47,929 SF |
| | 1.1 AC |

Filed 7/7/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| OLEN PROPERTIES CORP., | |
|    Plaintiff and Appellant, | G061427 |
|      v. | (Super. Ct. No. 30-2021-01185991) |
| CITY OF NEWPORT BEACH, | O R D E R |
|    Defendant and Respondent; | |
| TPG (KCN) ACQUISITION, LLC, | |
|    Real Party in Interest and Respondent; | |
| YIMBY LAW et al., | |
|    Interveners and Respondents. | |

California Building Industry Association, the Building Industry Association of the Bay Area, and California Business Properties Association have requested that our opinion filed on June 8, 2023 be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports.

                                    SANCHEZ, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


DELANEY, J.